COMMONWEALTH *vs.* WILLIAM NADWORNY.

Essex. September 11, 1985. — December 11, 1985.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Evidence,* Consciousness of guilt, State of mind, Expert opinion, Handwriting exemplar, Scientific test, Photograph. *Practice, Criminal,* Instructions to jury, Voluntariness of inculpatory statements, Dismissal. *Constitutional Law,* Self-incrimination, Admissions and confessions.

Although the cause of a young woman's death was not ascertainable by an examination of her body, the jury at a murder trial could properly find beyond a reasonable doubt that her death had occurred by homicide, where the evidence allowed the inferences that she was not depressed or inclined toward self-destruction on the day she was last seen alive, that she had been in good health and did not die of natural causes, and that no accident had occurred, and where there was ample testimony placing the victim at the defendant's apartment around seven o'clock on a certain evening, as well as testimony that the defendant had acknowledged that her death had occurred on the evening in question. [353-356]

The evidence at a murder trial was sufficient to permit the jury to find criminal agency on the part of the defendant, where they could conclude that he had a motive to kill the victim because he was disturbed and jealous over the ending of his romantic relationship with the victim and where they could also infer from the evidence that the victim had met her death in the defendant's apartment and in his sole presence and that she died in such a manner that the defendant was prompted to seek an unlawful alibi, secrete the body, and conceal the cause of death. [356-357]

At a murder trial, there was sufficient evidence, including the circumstances of the defendant's concealment of the victim's body during a period of four months and the defendant's statement to a friend that he hoped an autopsy would not reveal anything, to permit the jury to find that the defendant had acted with the requisite malice. [357-358]

Although, owing to the advanced state of decomposition of a young woman's body, a pathologist could not determine the time or cause of her death with reasonable medical certainty or eliminate death by natural causes, it was permissible for him to testify, at the trial of one accused of murdering her, that her death "could have" been caused by, or was "consistent with" various possible occurrences. [358-360]

There was no merit to a criminal defendant's contention that the judge at his trial for murder had, in effect, instructed the jury that the defendant's failure to obtain medical help for the victim could constitute murder in the second degree and that, therefore, the judge was required to instruct them on manslaughter. [360-361]

Although certain testimony proffered by a criminal defendant might properly have been admitted as tending to rebut an inference that one of his remarks revealed consciousness of guilt, its exclusion did not prejudice the defendant in view of the substantial additional evidence that the defendant had demonstrated consciousness of guilt. [361-362]

No infringement of a criminal defendant's privilege against self-incrimination resulted from a court order that he furnish an exemplar of his handwriting, following which the exemplar, containing the sentence, "I normally write with my right hand," was produced by him in the presence of a State police officer, where the exemplar was, in itself, physical, and not testimonial, evidence, and where the testimonial aspects of the defendant's declaration of righthandedness were, in the circumstances of the case, trivial and nonincriminating. [362-365]

At a murder trial, testimony by a State chemist that chemical tests had detected the presence of blood on the floor of certain storage bins in the defendant's apartment building and in the trunk of his automobile, but that the age of the stains and whether they were of human origin could not be determined, was merely cumulative, and its admission was not prejudicial to the defendant, where it was uncontested that the victim's body had been stored for some time in the trunk of the automobile, where there was other testimony tending to prove that the body had also been concealed for a time in one of the bins, and where there was testimony that, when discovered, the body was covered with bloodlike secretions. [365-366]

At a murder trial, the judge acted within his discretion in admitting in evidence photographs depicting the victim's body in an advanced stage of decomposition, where the state in which the body was found was evidence of malice and consciousness of guilt, and where the photographs assisted the jury in understanding a pathologist's testimony. [366-367]

At a murder trial, the judge did not abuse his discretion by admitting in evidence a photograph of the victim taken while she was alive, where the photograph was relevant on the question of identification and as tending to show that death due to ill health or suicide was unlikely. [367]

There was no error in the denial of a criminal defendant's pretrial motion to suppress, on due process and self-incrimination grounds, certain statements made by him during a telephone conversation with a police officer, inasmuch as the defendant was not in custody when the conversation occurred; nor, in the circumstances, did the defendant's interjection of the words, "I don't want to talk about it," at one point in the conversation render involuntary all of his statements that followed. [367-368]

At a murder trial during which evidence was received as to the defendant's statements to police during a noncustodial conversation, the judge acted within his discretion in excluding proffered testimony to the effect that the police had not preceded the conversation with Miranda warnings, where other testimony was adequate to preserve the issue of the voluntariness of the defendant's statements for the jury's determination. [368-370]

At a criminal trial, there was no error in the judge's instructions to the jury on the issue of the voluntariness of the defendant's incriminating statements. [370]

At a criminal trial, the judge adequately instructed the jury concerning the proper consideration of evidence of consciousness of guilt. [370-372]

A criminal defendant's motion to dismiss the indictment against him was correctly denied, where he made no showing that the integrity of the grand jury was impaired or that other extraordinary circumstances existed that might render the indictment vulnerable. [372]

INDICTMENT found and returned in the Superior Court Department on June 9, 1983.

A pretrial motion to suppress evidence was heard by *Andrew R. Linscott*, J., and the case was tried before *Robert A. Barton*, J.

The Supreme Judicial Court granted requests for direct appellate review.

*John J. Jennings* (*Charles M. Burnim* with him) for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney (*Frederick B. McAlary*, Assistant District Attorney, with her) for the Commonwealth.

LYNCH, J. On June 12, 1984, a jury convicted William Nadworny of murder in the second degree. He was sentenced to a term of life imprisonment at the Massachusetts Correctional Institution at Cedar Junction. The defendant filed a timely notice of appeal and later sought a stay of execution of sentence in the Appeals Court, which was allowed. Both parties filed applications for direct appellate review with this court. We granted both applications, and we affirm the conviction.

The defendant challenges his conviction on numerous grounds. He contends that the trial judge erred in not allowing his motions for required findings of not guilty. He also argues that the judge erred in failing to instruct the jury as to voluntary

and involuntary manslaughter. Next, he challenges the judge's jury charge regarding consciousness of guilt and alleges error in the judge's failure to establish a procedure for the admission and use of evidence of consciousness of guilt. In addition, he maintains that the judge committed several errors in the admission and exclusion of evidence. He further argues that it was an error to admit certain of the defendant's statements; to preclude him from establishing that he had not received Miranda warnings; and to fail to instruct the jury adequately on factors relative to the voluntariness of statements made by the defendant to the police. Finally, the defendant claims that the combined effect of several of the alleged evidentiary errors raises a substantial risk of a miscarriage of justice.

We state the evidence in some detail, because the case against the defendant was largely circumstantial. Lisa Belmonte was a seventeen year old student at Lynn Classical High School and lived with her family at 14 Breed Square in Lynn. The defendant was twenty-six years old, and until November, 1981, had lived next door to the Belmontes with his wife.

During the summer of 1981, Lisa and the defendant became romantically involved. Throughout the fall of 1981, the defendant would visit Lisa during her school lunch period almost every day and often picked her up at school. In November, 1981, the defendant separated from his wife and moved to a nearby apartment at 20 South Street, Lynn.

In the fall of 1981, as Lisa began to see more and more of the defendant, her behavior at home began to change. On the weekend prior to Thanksgiving, 1981, Lisa ran away from home and stayed at the defendant's apartment. She was found hiding in one of the basement storage bins in the defendant's apartment building.

As a result of this and other episodes of running away, Lisa's mother and father filed a petition under G. L. c. 119, §§ 39E-39J (1984 ed.) (CHINS), at Lynn District Court, and Lisa was referred to the Family and Children Services of Greater Lynn for counselling.

During this period, Lisa's schoolwork appeared relatively unaffected. Lisa was an "A student," her work was excellent,

and she was very attentive and sociable in school. She missed several weeks of school during the fall of 1981, yet she promptly made up the work. Her teachers saw no indication that during the school year of 1981, Lisa was a drug or alcohol user.

Lisa was in good health. She had never been hospitalized overnight. In September of 1981, she had a lump removed from her breast. Prior to this, a case of swollen glands when Lisa was in junior high school was her most serious episode of illness. The doctor who discovered the lump testified that he gave Lisa a complete physical on September 24, 1981, and that Lisa was in good health, except for the lump. A test for diabetes was also performed at this time and proved negative.

In January, 1982, Curt Willis, a former boyfriend of Lisa's who was then stationed in England with the United States Air Force, informed Lisa that he was to be discharged in March. At the beginning of 1982, Lisa's behavior improved and her mother testified that she was "back to her old self." In early March, Lisa picked Curt up at Logan International Airport and the two began seeing each other almost every day from then until Lisa's disappearance on March 18, 1982.

In January and February, 1982, there was a diminution of contact between Lisa and the defendant. Lisa's classmate and close friend, Debra Ann Lewis, testified that the defendant and Lisa were less frequently seen together during this period, and that, when the defendant would drive by and offer Lisa a ride, Lisa would turn the defendant down. At the end of February, the defendant told Debby that he loved Lisa and "couldn't bear it if they broke up," and asked Debby to tell Lisa that he wanted to see her. The defendant repeated these feelings to Debby Lewis during the course of more conversations throughout early March of 1982.

Presumably in response to a perceived lessening of Lisa's interest in their relationship, the defendant sent her a letter in early March. In it, he acknowledged the change in their relationship and the pain it caused him, the fact that Lisa was seeing Curt Willis "almost every night," and that the defendant felt "used" by her. He asked Lisa to telephone him so that they could get together.

Lisa sent the defendant a letter[1] which was received by him sometime during the beginning of March, in which she made clear that she intended to end their relationship and that if she met with the defendant again it would only be for the purpose of saying goodbye.

On March 18, 1982, Lisa attended a previously scheduled 5 P.M. appointment with Patricia Thompson, a clinical social worker and the counsellor Lisa had been seeing at the Family and Children Services of Greater Lynn. Patricia Thompson testified that Lisa "seemed in excellent spirits. She seemed to be functioning well in all areas of her life." Lisa seemed alert, and her morale was "excellent." Lisa told her that she was planning to break off the relationship with the defendant, had sent a letter to the defendant telling him of her intentions, and that the defendant had written back asking for one more meeting with her. Patricia Thompson and Lisa agreed that Lisa was improved enough to discontinue regularly scheduled counselling sessions. Lisa discussed the fact that she was again dating Curt Willis. Lisa stated that she intended to go over to the defendant's apartment immediately after the counselling session and break off the relationship. Lisa and Patricia Thompson "kind of rehearsed" what Lisa might say to the defendant. Patricia Thompson testified that Lisa was going to say "goodbye" and tell the defendant that she was going to continue to see Curt. Lisa left Patricia Thompson's office just before 6 P.M., seeming calm, cheerful, and perfectly normal.

---

[1] At trial, two copies of this letter were admitted in evidence. Two days after Lisa disappeared, the defendant allegedly told Lisa's mother that he "had a letter from Lisa and it was all torn up and in his barrel . . . but he would tape it together and send it to" her. Lisa's mother identified the copy introduced by the Commonwealth as an exact copy of the letter she received from the defendant two weeks after this conversation. The copy the Commonwealth had provided to defense counsel in compliance with pretrial discovery was identical in substance, but was pieced together differently from the copy offered at trial by the Commonwealth. Both copies were read to the jury over defense counsel's objections, but a challenge to the introduction of both letters was not raised on appeal and is therefore treated as waived. We observe, however, that the judge gave an appropriate clarifying instruction.

Curt Willis received a telephone call from Lisa at approximately 6 P.M. on March 18. She told him that she would call him later. Curt and Lisa had plans to go to a birthday party together on Friday, March 19. About 7 P.M., this same evening, Lisa telephoned Debby Lewis. Lisa told Debby that "she [Lisa] and Billy [the defendant] was talking [*sic*]." Debby noticed nothing unusual in Lisa's tone.

Earl Bethune, who worked with the defendant and was also a close friend, telephoned the defendant's apartment at 7 P.M. on March 18, 1982, to see if he could spend the night there. The defendant told him not to come. "Lisa's here," he said, "[w]hy don't you come over in a couple of hours She's going to be leaving shortly." Earl Bethune could hear a girl's voice over the telephone during this conversation. At about nine o'clock that night, Earl went to the defendant's apartment. He saw the defendant's car parked outside the apartment house and saw a light on in the defendant's apartment. Earl pushed the defendant's door buzzer persistently, but he received no answer. Lisa did not return home that night. She was never again seen alive by family or friends.

At about noon on March 19, 1982, Debby called the defendant and asked him where Lisa was. He replied that she was probably at school, and that she had left his apartment at 9:30 the night before.

At approximately 6 P.M., March 19, 1982, Earl Bethune went with the defendant to the defendant's apartment. Earl noticed a large red-brown stain on the defendant's white living room rug, which had not been there earlier in the week. The defendant said that someone had thrown up on the rug.[2] The defendant's door buzzer sounded and Lisa's sister, Stephanie, and Curt Willis could be seen on the defendant's television security monitor. The defendant said that if anyone asked where the defendant was the night before, Earl should say he was with the defendant. The defendant then let Stephanie and Curt in and told them that he did not know where Lisa was, and

---

[2] Several days later, the defendant told Earl that the stain was caused by someone spilling beer on the carpet.

had not seen her in weeks. After Stephanie and Curt left, the defendant told Earl that he had broken up with Lisa the night before and "she got bummed out and left."

The following morning, March 20, 1982, the defendant asked Earl to "alibi" for him if anyone asked where he was on the evening of March 18, 1982. At about 4 P.M. on the same day, Lisa's mother came to the defendant's apartment with Stephanie. Seeing the visitors on his television monitor, the defendant told Earl not to let them in because they wanted to "know where Lisa was" and he "didn't know" and "didn't want nothing to do with them." Earl nevertheless opened the door and the defendant told Lisa's mother he had no idea where Lisa was. The defendant then told Lisa's mother that Lisa had telephoned him the night before and told him that a friend of hers had given her some money and that she was at the Carriage House Motel on Route 1. The Belmontes drove out to the Carriage House immediately, but found no sign of Lisa.

After Lisa disappeared on March 18, 1982, Debby Lewis kept in contact with the defendant daily, trying to "figure out where [Lisa] could be." The defendant accused Debby of knowing where Lisa was. After Lisa had been missing a few weeks, the defendant told Earl Bethune that Lisa had been seen in New Hampshire "hijacking trucks."

In the beginning of April, 1982, Carol Fumicello, the manager of 20 South Street, noticed a terrible odor coming from the basement storage area. She traced the smell to bin number 7 which was locked. Bin number 8 was open and when she looked inside, she saw a dark, sticky, liquid substance on the floor, seeping out from under the wall separating bin number 8 from bin number 7. She asked Dana Bates, the building's maintenance man, to come down to the basement with her. He stated that the strong odor smelled like a dead body. Bates was coincidentally a Saugus police officer and had encountered dead bodies in the course of his police work. The owner of bin number 7 told Fumicello that he had lent the bin to the defendant. The defendant told Fumicello that he was storing a chemical adhesive for vinyl car roofs and would clean the bin that day. The next day Bates found the odor much improved

and saw that an absorbent material was on the floor of bin number 8.

Also in the beginning of April, 1982, the defendant asked Earl Bethune if he could store a 1971 Ford Maverick automobile in Earl's yard because the defendant's father's funeral business needed extra parking space.

On July 19, 1982, Earl Bethune was working on the roof of his garage with Tom Odgers, his tenant, and a carpenter. They smelled a strong odor coming from the vicinity of the car. When they examined the car, they found flies all around the cracks in the trunk and a more powerful odor. Tom Odgers said it "smells like a dead body." When Earl telephoned the defendant to obtain the trunk keys he was told that the smell was only garbage. Earl asked Tom to pry the trunk open. When Tom had opened the trunk lid four to six inches, the defendant drove up, ran to the car, slammed down the trunk lid and asked Tom what he was doing. The defendant then entered Earl's kitchen and asked him "not to say anything to anybody," "Lisa was in there [in the trunk]." He said Lisa was at his apartment one night and someone had injected her with an overdose. The defendant said he had been waiting to tell Earl for a long time, and that he did not know what to do. He had been afraid to telephone the police because he was afraid of Lisa's father. The defendant told Earl that he (the defendant) "wasn't supposed to be with [Lisa]," and that her father had said that if he found out the defendant had been with Lisa, he would kill the defendant. The defendant drove away in the Maverick.

Around 6 P.M., Earl and his wife Vanessa called the defendant's father, Richard Nadworny, and told him what had happened. The defendant's father telephoned the Lynn police, who proceeded to attempt to locate the defendant and his Maverick. During the course of a telephone conversation that evening, Vanessa Bethune said to the defendant, "If you didn't kill her [Lisa] and she died of an overdose, why don't you turn yourself in? You have nothing to hide." He answered, "I can't do that. I don't know what I am going to do." The defendant telephoned Debby about 10 P.M. The defendant told her that Lisa overdosed, that she had gone into convulsions,

that he tried to stop her, but that, if he had called an ambulance and she died, the Belmontes would blame him. He told Debby that Lisa was dead and added that "he wasn't in his right mind," and that no one would ever find him.

About 10:15 P.M., the defendant called his parents' home. After talking with the defendant, the defendant's mother handed the receiver to Officer Swiniarski of the Lynn police. The officer identified himself and asked the defendant about Lisa. The defendant replied, "She overdosed five months ago. I don't want to talk about it."

Shortly after midnight, July 20, 1982, two Lynn police officers, Sergeant Jackson and Chief Courtney, answered a call from the defendant's father, and went to the Nadworny family home. The defendant was with his family in the living room. Sergeant Jackson asked the defendant what he wanted to talk to him about. The defendant answered that "[s]he was very sick." Chief Courtney asked, "When was the last time you saw Lisa Belmonte?", and the defendant responded, "Haven't you heard? She overdosed and was in the trunk of the car." At this point, the defendant was given Miranda warnings and placed under arrest.

The defendant's Maverick was located in a car lot in Saugus. It was towed to Lynn Hospital, where a large canvas bag was removed from the trunk. After the canvas bag was cut open, several layers of plastic bags were also cut to reveal the maggot covered body of Lisa Belmonte.[3] Twenty-five feet of electrical cord bound the body into fetal position and wrapped the hands and feet together. The body was covered in bloodlike secretions.

Doctor Khalid Butt, an assistant pathologist at Lynn Hospital performed an autopsy on the body on July 20, 1982. He could determine no cause or time of death due to the body's advanced state of decomposition. However, he found no evidence of significant hematomas or gross injuries on the neck or throat, in the pleural cavity or the abdominal cavity, the back or the chest or on her lower legs. He found no major trauma to the head. Similarly, there were no large scars, injuries, or bullet

---

[3] The identity of the body is not contested.

marks on the lower legs and arms and no gross injury to the torso. The internal examination of the chest and abdominal cavity, and of the organs contained therein, revealed no suggestion of disease. Dr. Butt testified that in his opinion "it is extremely unlikely [Lisa] died of natural causes,"[4] and unlikely she had any heart disease.

Dr. Butt's initial examination revealed "some pitted marks . . . more than twenty five" in the right inguinal area, which he at first thought might have been needle marks. Upon microscopic examination, he revised his opinion and testified that the marks were caused by pressure because of the body's position, or by maggots. Dr. Butt testified on cross-examination that this area is "not the common area where people use to hide [drug injections] from other people." No track marks typical of drug abuse injection were found on the arms or legs, and no pills were detected in the stomach. An analysis of the liver on July 20, 1982, by a toxicologist for the Department of Public Safety revealed no drugs. In December, 1982, a Federal Bureau of Investigation examiner from the Chemistry/Toxicology Unit in Washington, D.C., analysed a liver specimen using very sensitive equipment[5] and no evidence of the four drug groups tested for was found. All of the drugs tested for could be expected to have registered trace amounts if present.

Dr. Butt testified that the condition of the body was consistent with death four months prior to autopsy. Indications of cause of death were consistent with "[s]uffocation, smothering, injection of different drugs, poisons, carbon monoxide poisoning, drowning, and a large number of chemicals."

---

[4] Dr. Butt's opinion on this issue was based on his findings during the autopsy, as well as these facts he was asked to assume by the assistant district attorney: That Lisa was a seventeen year old who had never been hospitalized except as an outpatient for swollen glands in 1979 and for removal of a lump in her left breast in September, 1981, and that on September 21, 1981, she had a complete physical examination and was found to be a normally healthy sixteen year old at that time.

[5] The toxicologist testified that one technique employed, gas chromotography - mass spectrometry, measured quantities of drugs in nanograms. He defined a nanogram as "about one-thirty billionth of one ounce."

In mid-August, 1982, the defendant told Earl Bethune that on the evening of March 18, 1982, the defendant came home from work and found Lisa dead on the floor of his apartment and that he did not telephone the police because he was afraid Lisa's father would kill him. When Earl asked the defendant what the autopsy revealed, the defendant replied, "Nothing. Hopefully they won't find anything." The defendant also mentioned that since he had helped his father, who was a funeral director, there really "wasn't that much" to carrying a dead body.

From the beginning of 1983, through the summer of that year the defendant spent time at Rockerfeller's Bar in Lynn and became friendly with a customer, Thomas Pagano, and later with a bartender, Patricia Flynn. In July, 1983, the defendant discussed Lisa's death and the Commonwealth's case against him with Pagano. The defendant said that on March 18, 1982, he had come home from a ski trip and found Lisa dead on his floor. He had picked her up, put her in a canvas bag, wrapped it with some cords, and carried it to the dumpster in the basement of his building. He explained the fact that blood was found on Lisa's body by saying that "it is possible [for blood] to come out of a body just because it is dead." He mentioned that the main evidence the Commonwealth was using against him was "blood stains from Lisa's body" found on the floor of his apartment and in the basement. He also added that Lisa did not take drugs. Patricia Flynn testified that in July, 1983, the defendant told her that he found Lisa dead when he came home from skiing. He said the body was all black and surrounded by vomit. He said he called "Hell's Angels types" to dispose of the body, he supplied ropes and bags, and they took care of it. He stated that Lisa did not take drugs, but that he felt she "shot up insulin" and that there was a family history of diabetes and insulin. During a later conversation, he explained the vomit by saying that "a body throws up after it dies."

1. *Denial of motions for a required finding of not guilty.* In reviewing the denial of motions for a required finding of not guilty in a criminal case we "consider whether 'the evidence

is insufficient as a matter of law to sustain a conviction on the charge.'" *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985), quoting Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The motion should be denied if " 'all the circumstances including inferences [that are not too remote according to the usual course of events] are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Shuman*, 391 Mass. 345, 350 (1984), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 676 (1979). We view the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Fuller*, 394 Mass. 251, 254 (1985). *Commonwealth* v. *Latimore, supra* at 676-677. The defendant contends the evidence against him is insufficient to prove cause of death, criminal agency, and malice aforethought.

a. *Cause of death.* The fact that the cause of death was not ascertainable from the body does not of itself preclude the Commonwealth from proving that the victim's death was by violence and the criminal agency of the defendant beyond a reasonable doubt. See *Commonwealth* v. *Webster*, 5 Cush. 295, 308-309 (1850). Although the case against the defendant is largely circumstantial it is well-settled that such evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Fuller, supra. Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54 (1975), and cases cited therein. To "conclude otherwise would mean that a criminal could commit a secret murder, destroy the body of the victim [or secrete it until advanced decomposition obscured the cause of death], and escape punishment despite convincing circumstantial evidence against him or her." *Wilkins* v. *State*, 96 Nev. 367, 374 (1980), citing *People* v. *Scott*, 176 Cal. App. 2d 458 (1959), appeal dismissed and cert. denied, 364 U.S. 471 (1960). See *Regina* v. *Onufrejczyk*, 1 All E.R. 247 (1955).

The jury had ample evidence from which they could reasonably conclude that Lisa met her death by violent means in the defendant's apartment on the evening of March 18, 1982, sometime after 7 P.M. The testimony of Patricia Thompson,

Earl Bethune, Curt Willis, and Debby Lewis all tended to show that Lisa was at the defendant's apartment at around 7 P.M. on that evening and that was the last time she was seen alive. Testimony by several witnesses, including that of Earl and Vanessa Bethune and Debby Lewis tended to establish that the defendant himself acknowledged Lisa's death in his apartment that evening. The defendant first told Earl that the large red-brown stain Earl noticed on the defendant's rug on March 19 was vomit, but later asserted it was a beer stain. Thomas Pagano testified that the defendant told him that the Commonwealth's evidence against him included "blood stains from Lisa's body" found on his apartment floor. The jury could infer from this evidence that the stain on the rug was Lisa's blood.

The jury could properly find that Lisa's death was not the result of suicide. Patricia Thompson testified that not only was Lisa happy and functioning well in all areas with excellent morale on March 18, but also that she determined that Lisa's outlook was positive enough for regularly scheduled counselling sessions to be terminated. Both Curt Willis, who spoke with Lisa at 6 P.M., and Debby Lewis, who talked with her at seven o'clock that night, said she sounded normal. Lisa had made plans to go to a party with Curt on the coming Friday and her mother indicated that Lisa was alert, friendly, and performing well during March. The jurors could infer that Lisa was not depressed or inclined toward self-destruction on March 18 and that she did not kill herself.

The jury could also reasonably infer that Lisa did not die of natural causes. She suffered no major illnesses and had undergone no surgical procedures except for the removal of a lump in her breast. There was no indication in the testimony of her mother, friends, and other people who knew her that she was in ill health. In fact, her mother testified that her health had been good. On September 24, 1981, Lisa had been given a complete physical examination and was found to be in good general health, aside from the lump. She also tested negative for diabetes on that date. Dr. Butt testified that based on his autopsy and the above information it was extremely

unlikely that Lisa died of natural causes. Moreover, the jury could properly infer that Lisa's death was not caused by accident. There was no evidence of accident. Dr. Butt testified that there was no evidence of major trauma to the body or broken bones, no pills were found in the stomach, and no large cranial hematomas. The defendant explained to his friends that she "was overdosed" by the hand of another, or "overdosed" herself. The jury were free to disbelieve this version of the events that evening. See *Commonwealth* v. *Campbell*, 378 Mass. 680, 689-690 (1979); see also *United States* v. *Systems Architects, Inc.*, 757 F.2d 373, 377 (1st Cir.), cert. denied, 474 U.S. 847 (1985) ("The Government . . . need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt").

b. *Agency*. There was also sufficient evidence for the jury to find criminal agency on the part of the defendant. A "web of convincing proof can be made up of inferences that are probable, not necessary." *Commonwealth* v. *Best*, 381 Mass. 472, 483 (1980). *Commonwealth* v. *Lanoue*, 392 Mass. 583, 590 (1984) (allowable inferences need not be necessary or inescapable). The jury could have found that, during January and February of 1982, the close, romantic relationship between the two had begun to cool, Lisa was pulling back and the defendant was disturbed and unhappy at the turn of events.[6]

From Lisa's letter and her statement to Patricia Thompson, the jury could infer that Lisa went to see the defendant on March 18, 1982, to end the relationship.[7] The jury could have believed that the defendant knew Lisa was seeing Curt regularly, that she did not wish to see the defendant, and that she

[6] These findings are supported by the testimony that during this period Lisa and the defendant were seen together less frequently and that she would turn down rides offered by him; that the defendant repeatedly expressed his concern about his lack of contact with Lisa, his desire to speak with her, his love for her, and that he could not bear to have the relationship broken off.

[7] The defendant contends that this testimony was admitted as evidence of Lisa's state of mind, relevant to the defendant's motive. He argues that the statement is insufficient to demonstrate that in fact she so informed the

felt the relationship was over. They could also infer that the defendant was still in love with her and wanted to see her very badly but that he also felt "used." This evidence permitted the jury to conclude that the defendant, being jealous, feeling "used," and unhappy and understanding that Lisa wanted to terminate their relationship, had a motive to kill her. From his own statements the jury could have concluded that he was in Lisa's presence when she died and from other evidence, that he was the only person present.

The jury, therefore, could have reasonably inferred that the defendant killed Lisa in his apartment on March 18, 1982, and immediately began his efforts to conceal her body. They could have believed that the defendant requested that Earl Bethune "alibi" for him and that the defendant told inconsistent stories concerning Lisa's condition when he saw her on March 18. There was ample evidence to support the conclusion that from the moment of her death to the time of its discovery, Lisa's body was either in the defendant's apartment, in the storage bin controlled by him, or in the trunk of his car. The jury could have considered the great length of time and manner in which the body was secreted as indicative of the defendant's attempts to conceal evidence of his criminal act.

In sum, therefore, the jury could infer that Lisa met her death at the hands of the defendant in his apartment and in his sole presence. They could infer that the manner in which the defendant killed her caused her to bleed and that she died in such a way that the defendant was prompted to seek an untruthful alibi and to secrete the body or conceal the cause of death.

c. *Malice.* Where the "crime charged is murder, the requisite mental state is malice aforethought." *Commonwealth* v. *Scanlon,*

---

defendant. See *Commonwealth* v. *Borodine,* 371 Mass. 1, 8-9 (1976), cert. denied, 429 U.S. 1049 (1977). The jury, however, would have been warranted in inferring that Lisa had communicated her intent to break off the relationship based on comments to that effect in her letter to him. Additionally, if "the victim was willing to tell third persons that her relationship with the defendant had deteriorated and that she had told or would tell the defendant that their relationship would end, it is inferable . . . she communicated her feelings to the defendant." *Id.* at 8, citing *Mutual Life Ins. Co.* v. *Hillmon,* 145 U.S. 285, 295-296 (1892).

373 Mass. 11, 18 (1977). We have already shown that the jury could have found that Lisa met her death at the hands of the defendant in his apartment on the evening of March 18, 1982, because of his dissatisfaction with the course of their love affair. On the basis of these findings the jury could infer that the defendant intentionally caused her death and that the requisite malice was therefore present. *Commonwealth* v. *Webster,* 5 Cush. 295 (1850). See *Commonwealth* v. *Forde,* 392 Mass. 453, 456 (1984); *Commonwealth* v. *Scanlon, supra; Commonwealth* v. *Mangum,* 357 Mass. 76, 85 (1970). Additional evidence exists from which the requisite malice can be found. The intent to inflict an injury may be inferred from, among other things, the condition of the body and the disposal of evidence. *Commonwealth* v. *Amazeen,* 375 Mass. 73, 81 (1978). The jury could properly have found that the nature and circumstances of the defendant's concealment of the body and its decomposed condition were indicative of his intent to harm Lisa. The defendant was the son of a funeral director and had helped his father with his work. Comments about a body's tendency to secrete fluids such as blood and vomit-like substances after death revealed his knowledge of a body's postmortem changes. His statement to Earl Bethune that he hoped the autopsy would not reveal anything, and the careful way the body was tied, compacted, and wrapped in two layers of plastic within a canvas bag and concealed for four months could properly be viewed by the jury as evidence that he injured Lisa intentionally and used his understanding of the decomposition process to cover up evidence which would reveal his intentional act, if the body was discovered soon after death.

2. *Pathologist's testimony.* The defendant contends that it was error to admit certain testimony of Dr. Butt since he could not determine time or cause of death to a reasonable medical certainty. The defendant alleges that Dr. Butt could not and did not testify to at least a degree of probability and instead testified only as to "possibilities." He maintains that the evidence was prejudicial because it allowed the expert as well as the jury to speculate. See *Hachadourian's Case,* 340 Mass. 81, 86 (1959); *Nass* v. *Duxbury,* 327 Mass. 396, 401-402 (1951). We disagree.

Dr. Butt acknowledged that the examples of causes of death he cited as consistent with his autopsy findings were not exhaustive and there were other ways Lisa could have died. He also acknowledged that each of those examples of causes of death could have been self-induced or could have occurred by accident. Of itself, the possibility that there could have been other causes of the victim's death does not render his opinion inadmissible. See *Commonwealth* v. *Tatro*, 4 Mass. App. Ct. 295, 305 (1976). It is, of course, true that when evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to be established by legitimate proof. *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985). *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). *Commonwealth* v. *McLeod*, 394 Mass. 727, 747 (1985), and cases cited therein. As already noted, however, there was other evidence besides Dr. Butt's testimony upon which the jury could reasonably rely to infer that death was not the result of suicide or accident. See *Commonwealth* v. *McLeod, supra.*

Dr. Butt testified that the victim's death could have been caused by and was "consistent with" "[s]uffocation, smothering, injection of different drugs, poisons, carbon monoxide poisoning, drowning, and a large number of chemicals." Use of phrases "consistent with" and "could have" does not render Dr. Butt's testimony incompetent. See *Commonwealth* v. *Perez*, 357 Mass. 290, 304-305 (1970); *Commonwealth* v. *Donoghue*, 266 Mass. 391, 396 (1929); *Commonwealth* v. *Cantor*, 253 Mass. 509, 513 (1925); *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 437 (1974), and cases cited. Cf. *Commonwealth* v. *Polian*, 288 Mass. 494, 501 (1934). Although such testimony is not evidence that death occurred in the manner stated, evidence " 'tending to show that there was nothing in the conditions disclosed at the autopsy inconsistent with the theory of the case based upon the other testimony offered by the Commonwealth . . . [is] competent.'. . . The 'other testimony' can be entirely circumstantial. . . . A jury could consider testimony of this character in excluding a hypothesis as to how a death was caused." *Commonwealth* v. *Burke*, 339 Mass. 521, 530-531 (1959), quoting *Commonwealth* v. *Cantor, supra.*

Neither is the testimony rendered speculative because the pathologist could not give an opinion on a specific cause of death. The significance of his opinion testimony was that the body's state of decomposition made it impossible to ascertain a cause of death with any more certainty and to eliminate death by disease or natural causes. Based on the discussion above, we conclude that it was not error to admit Dr. Butt's testimony. We observe that even had admission of this testimony been error, any possibility of prejudice was removed by prudent instructions by the judge to the jury prior to and during Dr. Butt's testimony as an expert witness.

3. *Request for instructions on manslaughter.* The defendant contends that the judge's charge to the jury allowed a reasonable juror to believe that failure of the defendant to obtain medical help for the victim could constitute murder in the second degree. He argues, therefore, that the failure of the judge to instruct on involuntary and voluntary manslaughter while permitting the jury to convict the defendant of murder for failure to act, was improper. He claims the judge further erred in declining to give a requested instruction clarifying that the law imposes no duty on the defendant to act.[8] We disagree and find no error.

The defendant's allegation that the judge's instructions permitted the jury to conclude the defendant could be convicted of murder in the second degree for failure to act focuses on portions of the charge stating that intent to kill "is not a necessary element of second degree murder" and that "malice in murder means a knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act." In assessing the sufficiency of jury instructions, we consider the charge in its entirety "to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function.'" *Commonwealth* v. *Richards*, 384 Mass. 396, 399-400 (1981), quoting

---

[8] The instruction requested by the defendant was: "You may not find the defendant guilty of any crime by reason of any failure or omission to act because the law imposes no duty on the defendant to take any action to preserve the life of another."

*United States* v. *Wharton,* 433 F.2d 451, 457 (D.C. Cir. 1970). See *Commonwealth* v. *Silva,* 388 Mass. 495, 507 (1983).[9]

Reviewing the charge as a whole, we are satisfied that no juror could reasonably infer that failure to act was a permissible basis for a second degree murder conviction in this case. There was, therefore, no error in the judge's refusal to instruct on manslaughter. Similarly, the judge did not err in denying the defendant's request for an instruction clarifying the defendant's lack of obligation to act.

A judge "may not charge on a hypothesis not supported by the evidence," *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 746 (1975); *Commonwealth* v. *Campbell,* 352 Mass. 387, 392 (1967), and no view of the evidence, resolving all reasonable inferences in favor of the defendant, *Commonwealth* v. *Vanderpool, supra,* permitted a finding of either involuntary or voluntary manslaughter.

4. *Exclusion of evidence.* At trial, Earl Bethune testified that in April, 1982, the defendant said that "someone told him

---

[9] The judge instructed the jury that "to prove murder in the second degree the Commonwealth must establish beyond a reasonable doubt . . . [n]umber one: That there was an *unlawful killing* of Lisa Belmonte by this Defendant" (emphasis added). This was repeated. In defining unlawful killing, the judge said, "The term unlawful killing refers to the absence of justification or excuse. For example, a killing is justified if authorized by law, as during a lawful battle in a lawful war or by a person acting in self-defense. If a killing is not excused in situations such as these however, the killing is unlawful." The judge then stated the following passage twice. "Further . . . the evidence must not only prove beyond a reasonable doubt a *death by violence,* but must also exclude — and that is exclude — beyond a reasonable doubt death by suicide, natural causes and accident" (emphasis added). The judge went on to state that "[a]n injury to another human being is not unlawful when occasioned by acts of misfortune. The burden of proof is on the Commonwealth to prove beyond a reasonable doubt *that the conduct of this Defendant was unlawful*; that *he caused injury by violence to the victim while she was alive.* If the Commonwealth fails in its burden to prove that the Defendant's actions were unlawful and that the *Defendant caused injury by violence to the victim while she was alive,* then you need not proceed further, but must return a verdict of not guilty" (emphasis added). As part of the definition of malice, the judge stated that it "is an *intention to inflict injury* without legal justification. Whether a killing is actually committed with malice aforethought is determined from the nature and the quality of the act which attends the killing" (emphasis added).

that [Lisa] was seen in New Hampshire hijacking trucks." Later, the defendant sought to introduce evidence that his father had been told this by Lynn police Officer Clara Zamejtis in April, 1982, and that his father had communicated the content of the discussion with Officer Zamejtis to the defendant. The defendant maintains that the judge wrongfully excluded this evidence, since it was offered to show the defendant's state of mind when he made the statement which would tend to rebut any inference that the defendant's remark to Earl Bethune was evidence of consciousness of guilt. See *Commonwealth v. Bohannon*, 376 Mass. 90, 94 (1978). This argument has some merit. We are satisified, however, that there is ample and substantial additional evidence of consciousness of guilt in this case to remove any possibility of prejudice to the defendant even if the excluded testimony might have served to blunt an inference that the defendant's comment to Earl Bethune demonstrated consciousness of guilt.[10]

5. *Handwriting exemplars.* The defendant contends that the admission of the letter purportedly written by him to Lisa constituted prejudicial error. He argues that in complying with the court order to furnish handwriting exemplars, he was compelled to violate his privilege against self-incrimination. We shall treat this claim as an invocation of the privilege under the Fifth Amendment to the United States Constitution.[11]

The handwriting exemplars were produced in the presence of a State police trooper. As part of the process, the defendant was required to copy the following two sentences, which involved his selection of the term "right" or "left" hand in each sentence he rewrote:

---

[10] We note that had the defendant's father's testimony been admitted and been believed, the jury could nevertheless have reasonably concluded that the defendant had repeated Officer Zamejtis' information to Earl Bethune knowing Lisa was already dead, intending to disguise his own guilt.

[11] At trial, the defendant objected to the admission of the handwriting exemplar and moved to strike the handwriting expert's testimony on Fifth Amendment grounds. On appeal, however, the defendant does not specify whether he alleges error under the Federal or State Constitutions, or both, and simply claims violation of his "privilege against self-incrimination." We consider only the Federal constitutional question as no objection under the Massachusetts Constitution was raised at trial.

"The above are samples of my handwriting with my (right/left) hand. I normally write with my (right/left) hand."

It is these sentences which the defendant maintains were testimonial and violative of his privilege against self incrimination.

It is established that the privilege of an accused not to be compelled to be a witness against himself protects only against the compulsion of incriminating "communications" or "testimony" and does not operate against compulsion "which makes a suspect or accused the 'source of real or physical evidence.' " *Commonwealth* v. *Brennan*, 386 Mass. 772, 776 (1982), quoting *Schmerber* v. *California*, 384 U.S. 757, 764 (1966). It is equally well-settled that handwriting constitutes "real or physical" evidence and thus does not come within the constitutional privilege protecting against compelled communications. *Gilbert* v. *California*, 388 U.S. 263, 266-267 (1967). A "mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the privilege]." *Id.*, citing *United States* v. *Wade*, 388 U.S. 218, 222-223 (1967).

This court has held that " 'testimonial' evidence, for the purpose of Fifth Amendment analysis, is evidence which reveals the subject's knowledge or thoughts concerning some fact." *Commonwealth* v. *Brennan, supra* at 778. Arguably, under this definition, the information sought by requiring the defendant to choose between "left" and "right" was more than mere "physical evidence" of the identifying characteristics of his penmanship,[12] since the defendant was compelled to reveal his

---

[12] The phrase "[t]he above are samples of my handwriting with my *right* hand" may also be testimonial according to the *Brennan* definition. It reveals the defendant's knowledge concerning a fact, which is, that he wrote it with his right hand. The Commonwealth, however, was possessed of that knowledge as well, since a State trooper witnessed the defendant's execution of the handwriting exemplar and testified at trial. This evidence is also very similar in kind to other compelled behavior found to be nontestimonial, as in field sobriety tests, where an accused is forced to exhibit his physical characteristics for observation by a police officer. See *Commonwealth* v. *Brennan, supra* at 779. Even if we considered the information that the defendant completed the handwriting exemplar with his right hand testimo-

subjective knowledge of his "righthandedness." To compel disclosure of knowledge of this sort is different from requiring the defendant to furnish an exemplar which discloses only the manner in which he forms his words and letters. See *United States* v. *Campbell*, 732 F.2d 1017, 1021-1022 (1st Cir. 1984) (to require the defendant to produce a handwriting exemplar by taking dictation would compel him to reveal his spelling. The resulting implied message, " [t]his is how I spell it," would be testimonial. " [S]pelling is an intellectual process as distinguished from the pure physical habit or characteristics that make handwriting demandable" ). Cf. *United States* v. *Pheaster*, 544 F.2d 353, 372 (9th Cir. 1976), cert. denied sub nom. *Inciso* v. *United States*, 429 U.S. 1099 (1977) (spelling and penmanship are both acquired through learning and both may tend to identify a defendant as author of a document, yet neither involve protected communication).

Even evidence which is both testimonial and compelled is not protected by the privilege if such evidence is "trivial" and does "not incriminate." *Commonwealth* v. *Hughes*, 380 Mass. 583, 590, cert. denied, 449 U.S. 900 (1980). See *id.*, citing *Fisher* v. *United States*, 425 U.S. 391, 411-413 (1976). We conclude that the defendant's declaration of his righthandedness is not protected under this standard.

The informational aspects of the exemplar were trivial since what is in issue is not whether the defendant writes with his right or left hand. *Commonwealth* v. *Hughes, supra. Fisher* v. *United States, supra.* Neither is the information that the defendant usually writes with his right hand incriminating. The defendant's righthandedness has absolutely

---

nial evidence, it is clearly trivial and nonincriminating and therefore unprotected by the Fifth Amendment privilege. The question of which hand the defendant actually used to complete the exemplar was "a foregone conclusion" having been observed and thus added "little or nothing" to the Commonwealth's information. See *Fisher* v. *United States*, 425 U.S 391, 411 (1976); *Commonwealth* v. *Hughes*, 380 Mass. 583, 590, cert. denied, 449 U.S. 900 (1980); and discussion *infra* at 364-365.

no direct bearing on his guilt or innocence in this case. This is not a case where a weapon was used in a manner indicating a righthanded or lefthanded assailant, nor as in *Commonwealth* v. *Hughes, supra,* a case where the defendant is compelled to reveal the existence of a fact which is an essential element of the Commonwealth's case (possession of a gun). The cases cited in *Hughes* similarly involve situations where the nexus between the incrimination of the defendant and the testimonial evidence compelled from him was more direct and immediate than in the instant case. *Id.* at 590-592. See, e.g., *United States* v. *Campos-Serrano,* 430 F.2d 173, 176 (7th Cir. 1970), cert. denied, 404 U.S. 1023 (1972) (defendant indicted for knowing possession of forged alien registration card. To pro-duce the card was tantamount to compelled production of "the crime itself"). Therefore, even if the declaration of righthand-edness is conceded to be testimonial, the compelled disclosure of this information does not violate the Fifth Amendment.

6. *Bloodstains; benzidine reagent test.* A Department of Public Safety chemist testified, over the defendant's objection, that he obtained positive reactions for the presence of blood when he performed a benzidine reagent test for blood in the trunk of the defendant's Maverick and on the floor of the basement storage bins number 7 and number 8. He could not determine how long the blood had been present, or whether any of the blood was human or animal. Further tests were performed to establish whether in fact the blood was human, but the results proved inconclusive.

This court has upheld admission of test results evidencing the presence of blood where it has not been possible to ascertain whether the blood is human or animal. We have said that this lack of conclusiveness is a matter of the weight of the evidence and not of its admissibility. *Commonwealth* v. *Murray,* 359 Mass. 541, 549 (1971). In cases both before and after *Murray,* however, similar evidence has been held to be inadmissible. See *Commonwealth* v. *Healy,* 393 Mass. 367, 382 (1984); *Commonwealth* v. *Horton,* 376 Mass. 380, 396-397 (1978), cert. denied sub nom. *Wideman* v. *Massachusetts,* 440 U.S. 923 (1979); *Commonwealth* v. *Burke,* 339 Mass. 521, 535

(1959). We do not decide whether the facts of the case would be controlled by *Murray* or *Burke* since the defendant suffered no prejudice from the admission of the evidence. The chemist's testimony was merely cumulative. Fumicello and Bates both testified that they saw a dark, sticky liquid on the floor of bin number 8, seeping from bin number 7 and Bates' statement that the odor resembled that of a dead body, was evidence from which the jury could infer the stain in the bins was blood. Moreover, the fact that Lisa's body was stored for at least some length of time in the trunk of the defendant's Maverick is not contested. This fact, combined with testimony that the body was covered with bloodlike secretions, permitted the inference that the stain in the trunk was Lisa's blood. Any error in the admission of the chemist's testimony under these circumstances was not prejudicial. See *Commonwealth* v. *Sazama*, 339 Mass. 154, 159 (1959).

7. *Photographs*. Postmortem photographs were admitted depicting the badly decomposed body of the deceased in the fetal position in which it had been bound. Portions of the bloodstained plastic bag in which the body had been wrapped were visible. The defendant argues that it was error to admit these pictures as they were inflammatory and of no probative value.

The admission of photographs is committed to the sound discretion of the trial judge and we have rarely reversed a conviction because of the production of photographs of a victim. *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 279 (1983), and cases cited. See *Commonwealth* v. *Richmond*, 371 Mass. 563, 564 (1976); *Commonwealth* v. *Allen*, 377 Mass. 674, 679 (1979). This is not a case where the photographs showed the body as altered in the course of an autopsy, which this court has said may present special problems. *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). The fact that photographs may be inflammatory does not bar their admission if they possess evidentiary value on a material matter. *Commonwealth* v. *Stewart*, 375 Mass. 380, 385 (1978). *Commonwealth* v. *Allen, supra*. In this case, the state in which the body was found, bound into a position which would best effectuate transportation and concealment, as well as its advanced

state of decomposition, was evidence of malice and conscious-
ness of guilt and thus probative of guilt. Moreover, the pictures
were relevant to assist the jury in understanding the
pathologist's testimony, particularly as to the fact that the de-
composition prevented establishing precise cause and time of
death. See *Commonwealth* v. *Todd,* 394 Mass. 791, 796 (1985)
(although a pathologist testifies as to cause of death, oral tes-
timony describing the victim's injuries may be supplemented
with photographs). The judge was careful to give a limiting
instruction when the photographs were presented to the jury,
see *Commonwealth* v. *Repoza,* 382 Mass. 119, 128-129 (1980),
and diligently reviewed the photographs, eliminating one as
redundant, see *Commonwealth* v. *Todd, supra.* The judge did
not abuse his discretion in admitting the photographs.

The defendant further objects to the admission of a photo-
graph of Lisa taken while she was alive. He contends that the
contrast between the decedent's "youthful and smiling face"
and the "gruesome" visage in the postmortem photographs was
inflammatory and prejudicial. We cannot agree that the judge
abused his discretion in the circumstances. The photograph
was relevant on the question of identification and as tending
to show that death due to ill health or suicide was unlikely.
Although during the trial the defendant offered to stipulate to
the indentity of the body to avoid admission of the picture,
and subsequently did so stipulate, a judge may generally "admit
relevant evidence even if a party has agreed to stipulate to the
fact that the offered evidence tends to prove." *Commonwealth*
v. *Bastarache, supra.* See *Commonwealth* v. *Todd, supra,*
citing *Commonwealth* v. *Stirling,* 351 Mass. 68, 71 (1966).

8. *Motion to suppress.* Prior to trial, the defendant moved
to suppress certain statements including those allegedly made
by him over the telephone to Officer Swiniarski. The motion
was denied and the statements were later admitted at trial. The
defendant argues that the remarks were involuntary and violated
his due process rights and his privilege against self incrimina-
tion.

The motion judge's finding that the defendant's statements
were not made during custodial interrogation and that no
Miranda rights therefore attached was clearly warranted and

is dispositive. Miranda warnings are necessary only for custo-
dial interrogations. *Oregon* v. *Mathiason*, 429 U.S. 492, 494-
495 (1977). *Commonwealth* v. *Bryant*, 390 Mass. 729, 736
(1984). The defendant was not subjected to custodial interro-
gation and therefore his reliance on cases concerning continued
interrogation in custodial situations where an accused has as-
serted the right to remain silent, e.g., *Commonwealth* v.
*Jackson*, 377 Mass. 319, 326 (1979); *Commonwealth* v. *Forde*,
392 Mass. 453, 455 (1984), is inapposite. Cf. *Commonwealth*
v. *Burke*, 339 Mass. 521, 532-533 (1959).

There remains the question whether certain of the defendant's
statements to Officer Swiniarski were voluntary. At one point
in the telephone conversation the defendant said, "I don't want
to talk about it." See *Commonwealth* v. *Mahnke*, 368 Mass.
662, 679 (1975), cert. denied, 425 U.S. 959 (1976). The
motion judge found that the defendant's statements later on in
the conversation in no way "contravene[d] due process volun-
tariness" and were free of coercion. The motion judge had an
ample basis for finding that nothing in the exchange between
Officer Swiniarski and the defendant resulted in the will of
the defendant being "overborne" so that what he said could be
considered involuntary. See *Rogers* v. *Richmond*, 365 U.S.
534, 544 (1961); *Schneckloth* v. *Bustamonte*, 412 U.S. 218,
226 (1973).

9. *Relevance of evidence of no Miranda warnings to question
of voluntariness before the jury.* The motion judge found that
the defendant's statements made during Sergeant Jackson and
Chief Courtney's visit to the Nadworny family home on July
20, 1983, were not made during custodial interrogation and
that no right to Miranda warnings attached.

The defendant now argues that the trial judge committed
prejudicial error in interrupting his cross-examination of
Sergeant Jackson[13] and prohibiting Jackson from answering the

---

[13] In his brief, the defendant mistakenly states that his objection to the
trial judge's cross-examination was "of the police officer who obtained the
incriminating statements over the telephone." That officer was Swiniarski.
The substance of the brief, and the defendant's citations to the transcript,
make clear that his objection concerns the cross-examination of Sergeant
Jackson.

question, "And yet when you spoke to [the defendant], you didn't advise him of his right to remain silent in any way?" The defendant alleges that the question whether Miranda rights had been given during Jackson's colloquy with the defendant was relevant to a jury determination of voluntariness. We find no error.

We agree with the motion judge that the portion of the defendant's conversation with Sergeant Jackson and Chief Courtney up through the defendant's response that Lisa was in the trunk, was not custodial interrogation. The motion judge found that the conversation took place at the defendant's family's home, at the defendant's request, and involved an officer who knew the defendant and his family well. See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966); *Oregon* v. *Mathiason, supra*; and see discussion in *Commonwealth* v. *Bryant*, 390 Mass. 729, 736-739 (1984).

During a bench conference, the trial judge acknowledged that the question of voluntariness was a live issue before the jury and ruled that the entire conversation between Sergeant Jackson and the defendant could be admitted in evidence on the issue of voluntariness. This included defense counsel's question, "Before you asked [the defendant] where Lisa Belmonte was, did you tell him of the thought that was in your mind, that he was a suspect of some kind?" to which Jackson replied, "No." Jackson's response to the defense counsel's question about whether he apprised the defendant of his right to remain silent early in the conversation was the only information excluded. The judge ruled that the question whether Miranda warnings had been or should have been given at the outset of the conversation had been litigated during the proceedings on pretrial motions and decided by the motion judge. While this court has said that evidence bearing on whether Miranda warnings were given is relevant in determining whether a confession is voluntary, such observations were made in cases involving custodial interrogation where Miranda warnings are required. See *Commonwealth* v. *Chung*, 378 Mass. 451, 458 n.9 (1979); *Commonwealth* v. *Tavares*, 385 Mass. 140, 153 n.19, cert. denied, 457 U.S. 1137 (1982). Where

statements are made during conversation where Miranda warn-
ings are not required, it is within the judge's discretion to
exclude testimony concerning the giving or failure to give
Miranda warnings as long as the judge preserves the basic
issue of voluntariness for the jury. We conclude that the req-
uisites of *Commonwealth* v. *Harris*, 371 Mass. 462, 469
(1976), were complied with.

10. *Request for instructions: voluntariness.* The defendant
contends that the trial judge erred in refusing to give his re-
quested instruction on the question of voluntariness of in-
criminating statements. Specifically, he maintains that he re-
quested "trickery" and "cajoling" be among the factors the jury
be required to consider on this issue and that the absence of
reference to these terms in the instructions given was error.
The judge was obligated to instruct the jury that "the Common-
wealth has the burden of proving beyond a reasonable doubt
that the [statements were] voluntary and that the jurors must
disregard [them] unless the Commonwealth has met its bur-
den." *Commonwealth* v. *Tavares, supra* at 152. Considering
the judge's charge as a whole, we are satisfied that he met
this obligation See *Commonwealth* v. *Lowe*, 391 Mass. 97,
110-111, cert. denied, 469 U.S. 840 (1984). Moreover, there
was no evidence of "trickery" or "cajoling" to indicate that
the requested instruction might have been required. Neverthe-
less, the judge's charge did discuss "coercion or force, either
physical or psychological." There was no error.

11. *Jury instruction: consciousness of guilt.* The defendant
asserts that the judge failed to instruct the jury concerning the
proper consideration of evidence of consciousness of guilt. He
alleges that the judge committed error by neglecting to charge
that the defendant may not be convicted on such evidence
alone, and that the judge failed to satisfy this court's directives
set out in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982).
There was no error.

*Commonwealth* v. *Toney, supra,* states that a judge should
instruct a jury "(1) that they are not to convict a defendant on
the basis of evidence of flight or concealment alone, . . . and
(2) that they may, but need not, consider such evidence as one

of the factors tending to prove the guilt of the defendant" (citations omitted). The judge's instructions concerning "false statements and concealment" are set out in full in the margin.[14] The charge, as given, adequately cautioned the jury "concerning the equivocal nature" of such evidence. *Id.* In *Toney*, this court recognized that concealment, flight, and other such acts "may often be prompted by something other than feelings of guilt . . . [and] that feelings of guilt may be present without actual guilt in neurotic, as well as so called 'normal,' people." *Id.* The judge here did address these concerns. Although the instruction given in the case at bar was not a model of clarity regarding the fact that a defendant may not be convicted on consciousness of guilt evidence alone, the instruction contained the substance of what we required in *Toney*. The judge stated that "[u]nder no circumstances may you presume the Defendant guilty from his false statements or concealment" and that "[y]ou should consider and weigh evidence of false statements and concealment . . . *in connection with all the other evidence* in this case . . ." (emphasis added).

The defendant also contends that the judge erred in refusing to give a requested instruction that acts and statements indicating consciousness of guilt be knowingly made, in that they must follow and not precede the crime. There was no error.

---

[14] The judge instructed as follows:

"False statements and concealment, if in fact you should find there were false statements and concealment — by a person after a crime has been committed, or after a defendant has been accused of a crime may be motivated by a variety of factors which are actually consistent with innocence. Such evidence does not create an inference of guilt, nor does the person's false statement or concealment necessarily reflect feelings of guilt. Furthermore, since innocent persons sometimes have feelings of guilt, such feelings do not necessarily reflect actual guilt. While you may consider false statements and concealment as one circumstance tending to show feelings of guilt, and while you may also consider feelings of guilt as evidence tending to show actual guilt, you are not required to do so. Under no circumstances may you presume the Defendant guilty from his false statements or concealment. You should consider and weigh evidence of false statements and concealment, if you find, in fact, that there is any by this Defendant in connection with all the other evidence in this case, and give it such weight as in your judgment it is fairly entitled to receive."

While we do not decide whether such an instruction was required, we observe that the judge referred to "false statements and concealment" at the outset of this instruction in the context of being "*after* a crime has been committed, or *after* a defendant has been accused of a crime" (emphasis added).

Additionally, the defendant maintains that the amount of consciousness of guilt evidence in this case required the judge to institute special procedures to insure the "legitimate use" of such evidence and to control prejudice. He argues that it constituted prejudicial error for the judge to deny his motion in limine, motion concerning order of trial, motion to bifurcate, and his request for a limiting instruction at the close of the Commonwealth's opening, which all concerned the introduction of evidence of consciousness of guilt. As discussed, the judge adequately instructed the jury on this matter in his charge. No additional procedures were required under the circumstances. There was no error.

12. *Denial of motion to dismiss the indictment.* The defendant claims that his motion to dismiss the indictment was erroneously denied as the only evidence of cause of death was hearsay given by a State police corporal and "impermissible and prejudicial information as to bloodstains" (i.e., the positive benzidine reagent test which did not determine whether the blood was human). We disagree. As a "general rule . . . a court should not inquire into the adequacy or competency of the evidence upon which an indictment is based . . . [except] when it appears that the integrity of the grand jury process has been impaired." *Commonwealth* v. *Salman*, 387 Mass. 160, 166 (1982), and cases cited. An indictment based in whole or in part on hearsay evidence before a grand jury may stand. *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 655 (1979). The defendant has failed to show that the integrity of the grand jury was impaired, or that "extraordinary circumstances" existed which might render the indictment vulnerable. See *id.* at 656, quoting *Commonwealth* v. *Comins*, 371 Mass. 222, 224 (1976), cert. denied, 430 U.S. 946 (1977).

13. *Conclusion.* Neither is there any basis to sustain the defendant's allegation of substantial risk of a miscarriage of

justice through the combined effect of several of the alleged
evidentiary errors.

*Judgment affirmed.*