COMMONWEALTH vs. WALTER TALKOWSKI.

No. 91-P-1495.

Suffolk. October 14, 1992. - December 18, 1992.

Present: DREBEN, KASS, & GREENBERG, JJ.

*Homicide. Intent. Practice, Criminal*, Instructions to jury, Presumptions and burden of proof.

In a criminal case in which the defendant was convicted of manslaughter on an indictment for first degree murder and it could not be determined on which theory of manslaughter, voluntary or involuntary, the defendant was found guilty by the jury, where the judge gave an inadvertent unconstitutional instruction on "presumed" intent, the instruction was not harmless beyond a reasonable doubt and the defendant was entitled to a new trial. [721-727]

INDICTMENT found and returned in the Superior Court on March 19, 1976.

A motion for postconviction relief, filed on August 28, 1991, was heard by *Robert W. Banks*, J.

*Owen S. Walker* for the defendant.

*Roger L. Michel, Jr.*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. In 1976, the defendant was convicted of manslaughter on an indictment for first degree murder. No appeal was taken. In 1991,[1] the defendant sought postconviction relief claiming that the jury had been given instructions as to presumed intent which violated *Sandstrom* v. *Montana*, 442 U.S. 510, 513 (1979), and that the instructions were not harmless beyond a reasonable doubt. Without explicitly determining that the instructions were erroneous, the motion

---

[1]Although the defendant has served his sentence, an affidavit of counsel explains that the validity of his conviction in this case bears on the sentence to be imposed on him in a case pending in Federal Court.

judge concluded that the defendant's conviction must have been based on involuntary manslaughter — an unintentional killing — and hence the charge on intent was beyond any reasonable doubt inconsequential to the jury's verdict.

On appeal from the denial of postconviction relief, the defendant concedes that if the jury found the defendant guilty of involuntary manslaughter, the instructions as to intent were harmless. He claims, however, that it is impossible to tell whether the jury convicted him of voluntary or involuntary manslaughter, and hence the judge was wrong in concluding that the instructions did not contribute to the verdict. We agree with the defendant that it cannot be determined on which theory of manslaughter the defendant was found guilty by the jury.[2] Accordingly, we reverse the defendant's conviction.

Since the Commonwealth argues that the instructions taken as a whole were valid, we must examine the challenged portions of the charge. After instructing the jury on first degree and second degree murder, the judge explained manslaughter as set forth in the margin.[3] After determining that the jury did not want a recess, the judge next instructed them:

"Of course, a criminal act must include the intention to do the act on the part of the actor. You must have the

_____

[2]Although in analyzing the evidence and the instructions the judge correctly applied the "harmless beyond a reasonable doubt" standard, in his discussion he also concluded "there is no likelihood of a substantial miscarriage of justice in denying Mr. Talkowski's motion."

[3]"Now, manslaughter differs from murder in that in manslaughter there need not be shown malice. Manslaughter may be of two different types: where it's voluntary or where it's involuntary.

"As to the involuntary manslaughter, I will read to you from one of our decisions:

'Involuntary manslaughter is an unlawful homicide, unintentionally caused, by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton, reckless conduct. *It may be characterized by a real design and purpose to kill but without malice.* It may be characterized as an unlawful homicide unintentionally caused in certain cases by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct.' " (Emphasis supplied.)

intent to do what you do, and, of course, no one knows what another person intends. You can't read the mind of anyone else. So, when one does an unlawful act, he is by law presumed to have intended to do it and to have intended the ordinary and natural consequences on the ground that these natural consequences must have been within his contemplation if he is the sane man and if he acts with a deliberation which ought to govern men in the conduct of their affairs. You are judged by what you do because that is how intent is inferred, because of our inability as human beings to read the mind of another.

"I used the word there 'inferences,' and let me explain what an inference is and the limitations upon it. An inference is a fact you draw from another fact. If in your deliberations you find that a fact, an essential fact, has been proved beyond a reasonable doubt, you can draw inferences from the existence of that fact to the existence of another fact."

The judge then gave the jury examples of inferences, e.g., if mail were left through the mail slot, the jury could infer that the mailman had come.

The Commonwealth urges that the subsequent discussion of inferences shows that the use of the word "presumed" was inadvertent. Even if reviewed with the "more tolerant" standard afforded instructions given in cases prior to the decision in *Sandstrom*, see *Commonwealth* v. *Repoza*, 400 Mass. 516, 520, cert. denied, 484 U.S. 935 (1987),[4] the judge's discussion of inferences did not sufficiently explain or modify his prior language that intent may be presumed in order "to en-

---

[4]There was no objection at trial to the now-challenged instruction. In *Repoza*, the Supreme Judicial Court noted that while States may insulate past convictions by enforcing the rule that a failure to object to a jury instruction is a waiver of any claim of error, see *Hankerson* v. *North Carolina*, 432 U.S. 233, 244 n.8 (1977), it would follow a moderate approach and not require lawyers to object to instructions not yet identified as constitutionally erroneous. The court would, however, be "more tolerant" in the review of instructions given before *Sandstrom*.

sure that a juror did not misunderstand the instructions or could not view them as burden-shifting." *Id.* at 521. The inference language could be interpreted as applying to inferences, other than intent, while leaving the impression that a mandatory, rather than a permissive, inference applied to intent.

Language contradicting or merely correcting a constitutionally infirm instruction will not suffice because "[a] reviewing court has no way of knowing which of two . . . . instructions the jurors applied in reaching their verdict." *Id.* at 519, quoting from *Francis* v. *Franklin*, 471 U.S. 307, 322 (1985). Some other portion of the charge must not only correct the error, but, through explanation, must harmonize it, as well. *Id.* at 520. There was in the present charge no explanation of the particular infirm language; the "general instructions as to the prosecution's burden and the defendant's presumption of innocence [did] not dissipate the error." *Francis* v. *Franklin, supra* at 320. *Commonwealth* v. *Repoza, supra* at 519.

Neither the trial judge's manslaughter instructions, see note 3, *supra,* nor the evidence supports the motion judge's conclusion that the jury must have found the defendant guilty of involuntary manslaughter. Although the trial judge purported to explain *involuntary* manslaughter, he included a definition which encompasses voluntary manslaughter, saying: "It may be characterized by a real design and purpose to kill but without malice." See note 3, *supra.* Moreover, during the course of their deliberations, the jury sent the following message to the judge, thereby indicating they wanted further instructions: "Definition of manslaughter, second degree, first degree."

In response, the judge discussed the degrees of murder and then defined manslaughter as follows:

> "And manslaughter, as I have indicated to you: that the crime of manslaughter imports the taking of a human life by an act not justified in law, but without the malice aforethought which is necessary to constitute murder. That is the difference between murder either in the

first or second degree and manslaughter. In manslaughter it is not necessary to show malice, the malice that I have described in its legal meaning.

"Manslaughter may be committed by an act which constitutes such a disregard of probable consequences to another as to constitute wanton, reckless conduct."

The defendant's counsel objected to the definition because the judge did not, according to counsel, describe the two parts of manslaughter, voluntary and involuntary. The judge then gave the additional instruction set forth in the margin.[5]

Looking at the manslaughter instructions, we cannot accept the Commonwealth's view that the jury were not instructed on voluntary manslaughter and that the discussion of that offense was only intended to clarify the instructions on involuntary manslaughter.

When we examine the evidence before the jury, a verdict of voluntary manslaughter becomes a distinct possibility. We have reviewed the entire transcript and concur with the following narrative of events by the motion judge, to which we have added a few interpolations.

"On December 14, 1975, William Rogers was shot to death during a street altercation occurring outside a house at 22 Granville Street in Dorchester. The cause of death was a gunshot wound to the victim's chest. Three defendants, Talkowski, his sister [Cathy Rackauskas] and his former wife were indicted and tried for first-degree murder of William Rogers. A directed verdict was ordered for [the defendant's] wife early in the trial. His sister pled guilty to manslaughter during the

---

[5] "I add to my remarks to you, Mr. Foreman and ladies and gentlemen, that manslaughter may be broken down into two separate categories: voluntary and involuntary. And voluntary manslaughter is an unlawful homicide where the circumstances are such, as the law says, as to palliate — palliating, lessening circumstances as to reduce the homicide to manslaughter; or it may be involuntary where there is an unlawful homicide which is characterized in certain cases by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct."

trial. The jury returned a verdict of guilty of the lesser-included offense of manslaughter against Talkowski.

"Evidence adduced at trial showed that several hours before the shooting, defendant's wife and a woman by the name of Nancy McDougall got into a fight at a bar in South Boston. Defendant removed his wife from the bar. Shortly after, defendant returned to the premises, took a cursory look around and left the area. Thereafter, Nancy McDougall, Edward Rogers and the victim [Edward's brother, William Rogers,] left the bar and drove to 22 Granville Street. [They had previously stopped and had noticed a Cadillac behind them.] As they [left] their car, [the Cadillac] arrived [from] which three people [alighted].

"There were two main prosecution witnesses who testified to the ensuing altercation. Edward Rogers testified that, having recognized and known one of the people as Cathy Rackauskas, he walked over towards her, and they had a brief conversation. [She was standing on the sidewalk holding a shotgun.] [Edward] Rogers then testified that William Rogers came over and said, 'If you want to bring guns into it, we could have brought guns into it.' He further testified that defendant said to Cathy, 'Blast him, blast him,' but Cathy did not respond. According to the testimony of Rogers, defendant grabbed the gun and a shot went off which caused the death of William Rogers. [McDougall confirmed what the defendant had said to Cathy and testified that he 'grabbed the gun out of her hands and shot Billy.']^[6]

"Defense counsel raised evidence of the defense that the shooting was an accident,[7] as well as arguing that

---

[6]On cross-examination, she was asked, "And did you see the male lunge and grab the gun, and, as he did, it went off? Did you see that?" Her answer was "Yes, sir." She was then asked, "And that's the way it happened?" She again answered, "Yes, sir."

[7]The medical examiner, on cross-examination by counsel for Catherine Rackauskas, testified that the wound was consistent with an accident. Joseph Allen (the bartender) on cross-examination was asked who was the

the defendant was not present at the altercation."
[Counsel in closing stressed that there was no motive
and that the defendant did not even know the Rogers
brothers.]

The evidence, particularly the shout, "Blast him, Blast
him," which immediately preceded the shot, warranted a
finding by the jury that there was an intentional killing.
Since the only explanation given to the jury concerning the
circumstances which reduce homicide to voluntary man-
slaughter, see note 5, *supra*, are those which "palliate — pal-
liating, lessening circumstances," the jury were completely
free to determine which circumstances were palliating. Thus,
they might have construed William's statement about bring-
ing guns as a hostile and threatening statement which pro-
voked the defendant, they might have considered the bar-
room fight as a palliating factor, or they might have
determined something else to be a lessening factor. We,
therefore, are not confident, as was the motion judge, that
the defendant "must have been convicted of involuntary
manslaughter — an unintentional killing." We also cannot
infer beyond a reasonable doubt that, if the jury found the
defendant guilty of voluntary manslaughter, the evidence the
jury considered on the issue of intent, independent of the pre-
sumption, was such that the unconstitutional presumption
did not contribute to the verdict. See *Yates* v. *Evatt*, 111 S.
Ct. 1884, 1897 (1991).

What makes this case difficult is that a review of the evi-
dence and the question of the jury during deliberations, and
the very weak suggestion of accident, see note 7, *supra*,
strongly suggest that if the instructions had been correct the
jury would have found involuntary manslaughter, if not vol-

---

first person that talked about this case. He answered "By what time? As
soon as when this accident occurred or . . . " These were the only times the
jury heard evidence of accident.

There was no charge on accident and no request for one. Although de-
fense counsel did not argue that the gun went off by accident, he repeated
Joseph Allen's answer referring to accident and said, "Think about that."
Cf. *Commonwealth* v. *Repoza*, 400 Mass. at 522 n.7.

untary manslaughter. Nevertheless, since we cannot determine that the jury found guilt without relying on the unconstitutional presumption, we are constrained to conclude that the motion· for a new trial should have been granted. The judgment is reversed, the verdict is set aside, and the case is remanded for such further proceedings as are consistent with this opinion. See *Griffin* v. *United States*, 112 S. Ct. 466, 471-474 (1991). See also *Yates* v. *United States*, 354 U.S. 298, 312 (1957); *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988); *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720, 724 (1991).

*So ordered.*