## COMMONWEALTH vs. KEITH KNIGHT.

No. 93-P-324.

Suffolk. May 6, 1994. - July 28, 1994.

Present: PERRETTA, FINE, & GILLERMAN, JJ.

*Homicide. Practice, Criminal*, Required finding, Instructions to jury. *Malice. Intent. Intoxication.*

At a murder trial in which the prosecution could not conclusively establish the cause or manner of the victim's death, the evidence, including the defendant's statements to the effect that he and the victim had been fighting and he thought he might have killed her, along with the defendant's presence and opportunity to commit the crime and the compelling evidence of his consciousness of guilt, although circumstantial, provided a basis for a reasonable jury to infer the elements of the crime of manslaughter beyond a reasonable doubt: the judge properly denied the defendant's motion for a required finding of not guilty. [97-99]

At a murder trial in which the defense theory was that the victim's death was accidental or, if not, that the defendant's intoxication and a fight he had with the victim reduced the crime to manslaughter and in which the defendant was convicted of manslaughter, the defendant demonstrated no prejudice from the judge's having given a jury instruction on manslaughter at the specific request of defense counsel that did not expressly set forth the state of mind required for either voluntary or involuntary manslaughter, where, in light of the entire charge and the evidence presented, the jury could not have found the defendant guilty without the required elements. [99-105]

INDICTMENT found and returned in the Superior Court Department on May 1, 1991.

The case was tried before *John J. Irwin, Jr.,* J.

*Eric Brandt,* Committee for Public Counsel Services, for the defendant.

*Edmond J. Zabin,* Assistant District Attorney, for the Commonwealth.

FINE, J. The body of Marie DuBuissant was recovered from behind a false fireplace in the apartment she shared with the defendant in the Dorchester section of Boston. The

defendant was charged with murder. After a jury trial in the Superior Court, the defendant was convicted of so much of the indictment as charged manslaughter. On appeal, the defendant challenges the sufficiency of the evidence and the instructions on manslaughter. We affirm.

We describe the Commonwealth's case.[1] When the Boston police found DuBuissant's body on Friday, November 23, 1992, it was wrapped in a bedspread, covered by a sheet, surrounded by mattress material, and stuffed tightly headfirst into a cramped space. It was undisputed that the defendant was present at the time of death, sometime between 8 P.M. on the Monday before Thanksgiving in 1992 and 4:00 the next morning. No other adults were present, but the victim's six year old daughter, Jessica, presumably was home sleeping. DuBuissant was last seen alive by a close friend, Doris Fields, on Monday at about 3 P.M. when, as usual, they met their children at school and walked home. DuBuissant and Fields had planned to have Thanksgiving dinner together. About 8 or 8:30 Monday evening, DuBuissant called Fields to find out what time she planned to arrive for Thanksgiving dinner and to discuss the menu. They spoke for about thirty minutes. About 10:45 P.M., DuBuissant's upstairs neighbor, Margaret Brown, came home from work. She heard loud music coming from DuBuissant's apartment. After falling asleep, Brown was awakened at 2 A.M. by a loud crash. She described it as "sounding like something heavy fell." She went downstairs, knocked on DuBuissant's door and asked her not to be so loud. No one answered, and she heard nothing inside. After knocking again and receiving no response, she went back upstairs. The following morning, approximately 9 A.M., Brown saw the defendant leave DuBuissant's apartment to take out a small bag of trash.

The defendant had known DuBuissant for at least two years and lived with her in the Dorchester apartment. There was no evidence of any romantic relationship between the two; they were described as friends. The defendant had a

---

[1]The defendant presented no witnesses or other evidence in his behalf.

girlfriend, Michelle Roddy, who testified further about the events that occurred in the early morning hours on Tuesday. The defendant called Roddy about 4:00 Tuesday morning and told her to come to the apartment. When Roddy arrived about 5 A.M., the defendant, who appeared nervous and odd, told her "something had happened." He also said, "an accident happened." Although Roddy had no trouble understanding the defendant when he telephoned at 4 A.M., at 5 A.M. he was visibly intoxicated and had difficulty standing. He was leaning over for support. As Roddy began to walk toward the bathroom, she asked where DuBuissant was, and the defendant responded that "they were arguing and that there had been an accident . . . [a]nd that she had fallen and hit her head." The defendant told her not to go any further toward the bathroom, but Roddy, who had already reached the bathroom, looked inside and saw DuBuissant's naked body in the bathtub. Again, Roddy inquired as to what had happened, and the defendant responded that "it was an accident" and that "he thought he might have killed her." The defendant repeated that he and the victim had been arguing and "they were fighting and that he might have killed her." The defendant then asked Roddy what they were going to do; she responded that she did not know. Apparently due to intoxication, he fell in the hall, and Roddy helped him up and to the bed in the victim's bedroom where he went to sleep. Roddy slept beside him.

Later that morning, Jessica entered the bedroom and said it was time for her to go to school. After taking Jessica to school, Roddy returned to the apartment. When she returned, the defendant was getting dressed and had left the bedroom. He was again asking her what to do, and she said she did not know. He told her to go home and come back at noon "so he could think." When she returned later that day, the defendant seemed nervous and said he needed Roddy to get some trash bags, to help clean up. She tried to get trash bags from a neighbor but was unsuccessful and returned. The defendant told Roddy to stay in the living room. When she got up to go into the hall, she saw the defendant pull the

body, in a sheet, into Jessica's room. Several minutes later he came out of the room and again told Roddy to go home and return later. She returned about 1 P.M. and spent the night with the defendant.

On Wednesday morning, the defendant went out to retrieve DuBuissant's mail. After he opened the mail, the defendant gave DuBuissant's $223 welfare check to Roddy and asked her to cash it because he "needed the money." The defendant took Roddy's identification card and, using an iron, placed Roddy's picture on DuBuissant's identification card. Roddy was arrested at a nearby grocery store for trying to cash the victim's welfare check. She did not see the defendant again until Friday.

DuBuissant's whereabouts had become a mystery to her friends and neighbors. On Tuesday morning, the victim's landlord asked the defendant where DuBuissant was, and the defendant answered that she was with her boyfriend. The same day, the defendant told the landlord's son that DuBuissant had left him home with her daughter. Later that day, Fields asked the defendant if he knew where DuBuissant was, and the defendant told her that DuBuissant left the house at 11 P.M. Monday, with a man, drinking.

On Tuesday morning, when Fields took her son to school, she saw Jessica in the cold November weather without a coat and in a short-sleeved dress. About noon, the defendant went to Fields's home and asked her to pick Jessica up from school because he had something to do. After picking Jessica up around 3 P.M., Fields called DuBuissant's apartment to see if she was there yet. The defendant answered the phone. About fifteen minutes later, Fields took Jessica to the apartment. That afternoon, Fields called DuBuissant's apartment every hour to see if she had returned. Each time, the defendant answered. Fields finally called the police. About 8 P.M. Tuesday, Boston police were dispatched to the victim's apartment in response to a report of Jessica's being left alone. When one of the officers entered the apartment, he noticed a strange odor, but he did not think much of it at the time.

The officers brought Jessica to Fields's home where she stayed until Friday.

From Tuesday until Friday, Fields phoned DuBuissant's apartment about twenty times; each time, the defendant answered. Fields went to the apartment twice, and each time the defendant was there. On Friday, Fields tried to get additional clothes for Jessica. The defendant was at his grandmother's house a block away. Fields's request of the defendant for clothes for Jessica or for a key to the apartment was refused. Fields then found DuBuissant's landlord, with whom she returned to the apartment, broke the lock, and went inside. Fields went directly into Jessica's bedroom to retrieve some clothing for her, and she noticed that Jessica's mattress was missing. She saw that the victim's clothes, including her winter coat, were still in the closet, that all of her shoes were in the apartment, and that the bricks in front of the fireplace in the living room were pulled away from the wall. When she detected a strange odor coming from the fireplace, she asked the landlord to pull the bricks from the wall, and there she saw the victim's hair and a lot of cotton cloth stuffed into the wall. The police were called, and they removed the victim's body from the fireplace.

Outside the apartment, one of the officers noticed an old mattress with the stuffing removed. A partial box spring with stuffing and straw hanging from it was found in Jessica's room. The stuffing in the fireplace appeared to be the same as that of the stripped mattress, and samples of the stuffing in Jessica's bedroom matched the stuffing in the fireplace.

Homicide detectives collected other physical evidence from the apartment. The sheet and bedspread in which the body was wrapped tested positive for blood. Police also recovered from DuBuissant's bedroom a sheet, a pillow case, a laundry bag, and a sleeveless jersey, all of which tested positive for blood, and they found a bloodstained female undergarment near the body.

Dr. Leonard Atkins, a medical examiner, performed an autopsy and determined that the cause of death was asphyxia, which he defined as a cutting off of the supply of air.

Dr. Atkins testified that homicide by asphyxia can occur without physical injury, such as when one covers the victim's mouth with a pillow. He found no injuries, internal or external, to the victim's head, chest, neck, or abdomen. He noted that there was extensive skin slippage and blistering, due to body decomposition, and that an obnoxious odor was present, a result of the growth of bacteria in the body. A blood and body fluid sample showed the presence of a small quantity of alcohol which he attributed largely to alcohol formed by tissue decomposition. Otherwise, there was no evidence of drugs or alcohol in the victim's body.

Dr. Atkins noted on cross-examination that one would need to apply some pressure to suffocate someone with a pillow. He acknowledged that he found no lacerations or bruises in the mouth, lip, and teeth area. There was no evidence of pinpoint hemorrhaging, which is usually associated with violent strangling or suffocation. On redirect, Dr. Atkins stated that the absence of evidence of bruising on the mouth or lips is not necessarily inconsistent with asphyxia. He also said it was not uncommon to see cases of asphyxia without pinpoint hemorrhaging. Defense counsel, on cross-examination, asked Dr. Atkins about a variety of possible causes of death that might not show up in an autopsy, including electrocution and overdose of drugs other than the barbiturates, opiates, and methamphetamine tested for. Defense counsel also asked about diseases, such as sickle cell anemia and arrythmia, but Dr. Atkins noted that there was no evidence that the victim suffered from these or any other ailments.

1. *Sufficiency of the evidence of manslaughter.* In reviewing a judge's decision to deny a motion for a required finding of not guilty, the inquiry is whether the evidence, considered in the light most favorable to the Commonwealth, see *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), could satisfy a reasonable jury of each element of the crime beyond a reasonable doubt. In cases in which the evidence is largely circumstantial, "it is not essential that the inferences drawn should be the only necessary inferences . . . . It is enough that [the inferences]

be reasonable and possible." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992), quoting from *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926).

The defendant contends that his conviction should be overturned because the evidence failed to establish, beyond a reasonable doubt, that he committed any intentional physical act that caused the decedent's death. He contends that the evidence that the decedent did not die accidentally required "impermissible conjecture or surmise." *Commonwealth* v. *Salemme*, 395 Mass. 594, 600 (1985).

The defendant relies upon the inconclusiveness of the medical examiner's opinion as to the manner of death. Dr. Atkins attributed the death to asphyxia which, he stated, may occur without physical injury, as where a person is suffocated with a pillow. Dr. Atkins also testified that the absence of signs of physical injury was not necessarily inconsistent with suffocation. The defendant is correct that Dr. Atkins's testimony, by itself, is not sufficient to establish that the defendant suffocated the victim. However, "[t]he fact that the cause [or manner] of death was not ascertainable from the body does not itself preclude the Commonwealth from proving that the victim's death was by violence and the criminal agency of the defendant beyond a reasonable doubt." *Commonwealth* v. *Nadworny*, 396 Mass. at 354. See also *Commonwealth* v. *Gallison*, 383 Mass. 659, 667 (1981). "To 'conclude otherwise would mean that a criminal could commit a secret murder, destroy the body of the victim [or secrete it until advanced decomposition obscured the cause of death], and escape punishment despite convincing circumstantial evidence against him or her.' " *Commonwealth* v. *Nadworny*, 396 Mass. at 354, quoting from *Wilkins* v. *State*, 96 Nev. 367, 374 (1980). The defendant also relies on his own account to Roddy that "an accident happened" and "she fell and hit her head" and, in addition, on the upstairs neighbor's testimony that she heard a loud crashing noise. However, the jury reasonably could have rejected the defendant's description of the event as an accident. See *Commonwealth* v. *Nadworny*, 396 Mass. at 356. Dr. Atkins's observations that

there were no injuries or blows on the victim's body and no evidence of trauma made it unlikely that the victim died as a result of a fall.

The jury could reasonably have inferred from the defendant's statements, to the effect that he and DuBuissant had been fighting and he thought he might have killed her, that he intentionally committed some physical act that resulted in her death. Considering the defendant's statements along with his undisputed presence and unique opportunity to commit the crime, as well as the compelling evidence of consciousness of guilt (concealing the body, lying about the victim's whereabouts, and attempting to have the victim's welfare check cashed), the evidence, although circumstantial, was sufficient to withstand the motion for a required finding of not guilty. Compare *Commonwealth* v. *Martino*, 412 Mass. at 271-272 (evidence sufficient to support verdict of first degree murder where defendant acknowledged he and victim had fought shortly before the murder and admitted being present at approximate time of murder, a note in defendant's handwriting and bearing defendant's footprint was found under body, hair was found in victim's mouth similar to samples of defendant's hair, and other notes written by defendant could be seen to have incriminatory tone); *Commonwealth* v. *Jackson*, 417 Mass. 830, 843 (1994)(evidence of murder sufficient where hair similar to victim's was found in defendant's car, defendant displayed consciousness of guilt, and defendant possessed means to commit the crime and tried to destroy evidence of the crime).

2. *The judge's instructions on manslaughter.* Relying on *Commonwealth* v. *Sires*, 413 Mass. 292, 302 (1992), the defendant contends that his manslaughter conviction cannot stand because the judge's instructions on manslaughter permitted the jury to find the defendant guilty on a theory not recognized in our jurisprudence. As the challenged instruction was given upon the specific request of defense counsel at trial, to the extent that the issue is reviewable at all, see *Lannon* v. *Commonwealth*, 379 Mass. 786, 792-793 (1980); *Commonwealth* v. *Gladney*, 34 Mass. App. Ct. 151, 158 n.3

(1993),[2] the defendant on appeal bears a heavy burden in attempting to have his conviction overturned. He must demonstrate at least a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Goulet*, 374 Mass. 404, 415 (1978).

We place the challenged instruction in context. The judge instructed the jury on murder,[3] defining it as an unlawful killing with malice. He described malice generally and outlined its three forms,[4] and he stated that, in determining whether the defendant had the specific intent or knowledge required for malice, the jurors could consider evidence of the defendant's voluntary intoxication. See *Commonwealth* v. *Grey*, 399 Mass. 469 (1987); *Commonwealth* v. *Sama*, 411 Mass. 293 (1991). Manslaughter, the judge said, is "an unlawful killing without malice aforethought." He first discussed voluntary manslaughter, saying it is "an unlawful killing which arises from a sudden transport of passion or heat of blood upon reasonable provocation and without malice or in sudden combat." He then gave the instruction in issue:

> "[T]here's another possible . . . basis for a manslaughter verdict. If you should determine that the defendant killed the deceased without justification or excuse but that because of his mental condition or voluntary intoxication at the time the defendant could not form the specific intent necessary for you to find that he acted with malice aforethought, then you may find him guilty of

---

[2]There is abundant Federal case law to the effect that invited error is not reviewable. See *United States* v. *Gray*, 626 F.2d 494, 501 (5th Cir. 1980); *United States* v. *Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986); *United States* v. *Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991); *United States* v. *Jacoby*, 955 F.2d 1527, 1544 (11th Cir. 1992); *United States* v. *Concemi*, 957 F.2d 942, 946 (1st Cir. 1992).

[3]The judge told the jurors that they could find first degree murder if they found an unlawful killing, one without justification or excuse, with malice and deliberate premeditation. Otherwise, if they found an unlawful killing with malice, they could find second degree murder.

[4]The judge said malice "includes any unexcused specific intent to kill, an unexcused specific intent to do grievous bodily harm, or an unexcused intent to do a particular act creating a plain and strong likelihood that either death or grievous bodily harm will follow."

manslaughter. Have in mind, of course, that that goes back to the instruction that I gave you with reference to malice aforethought and evidence of voluntary intoxication. If there is evidence of voluntary intoxication, you have a right to consider that on whether or not malice aforethought has been proved beyond a reasonable doubt; and the government has that burden of proof. So let's just assume, hypothetically, that you make a determination that because of a condition of voluntary intoxication the defendant had not been proved to you beyond a reasonable doubt to have had that state of mind of malice necessary to constitute murder but, indeed, that notwithstanding that the government had proved to you beyond a reasonable doubt that there was an unlawful killing without malice, then you may find the defendant guilty of manslaughter."

At another point in his instructions, the judge made clear that if the death was accidental it should result in an acquittal.

The defendant is correct that the jury could have convicted the defendant of manslaughter on the basis of the challenged instruction rather than on the traditional theory of voluntary manslaughter upon reasonable provocation on which they were also instructed. He contends that under *Commonwealth v. Sires*, 413 Mass. at 302, the instruction was improper. In *Sires*, the defendant was convicted of first degree murder on evidence that he shot his mother several times while she was lying in bed. The defense was that he was intoxicated at the time. The defendant challenged his murder conviction on, among other things, the ground that the judge had failed to give an instruction on involuntary manslaughter.[5] On appeal, the court held that on no view of the evidence was such an instruction warranted. The defendant's actual request for the instruction was phrased in terms similar to the one chal-

---

[5]The judge gave an instruction on voluntary manslaughter which the court on appeal said was not warranted in the absence of adequate provocation or any mitigating circumstances.

lenged in the present case. He asked the judge to instruct in essence that "the effects of alcohol consumption could negate malice and that, if so, the result would be that the defendant would be guilty of manslaughter." *Commonwealth* v. *Sires*, 413 Mass. at 302. Of the requested instruction, the court said: "The defendant's theory of manslaughter does not conform to any definition of the crime of· involuntary manslaughter that this court has endorsed. A killing without malice does not automatically become involuntary manslaughter. The traditional elements of involuntary manslaughter must be shown by evidence that the jury might believe before an instruction on involuntary manslaughter is required." *Id.* at 302-303. See also *Commonwealth* v. *Ferreira*, 417 Mass. 592, 599 (1994); McMahon, Murder, Malice and Mental State, 78 Mass. L. Rev. 40, 48 (1993). Similarly, in the instant case, the defendant argues that the challenged instruction did not set forth the state of mind required for either voluntary or involuntary manslaughter and therefore allowed his conviction on an improper theory.[6]

We assume that the defendant is correct in interpreting *Commonwealth* v. *Sires* to mean that in a case in which a defendant is charged with murder, where the jurors are in-

---

[6]We do not understand the defendant to contend that, absent a finding of malice, the evidence of his intoxication would entitle him to an acquittal. Such a contention would be inconsistent with established law to the effect that voluntary intoxication is not a defense to a criminal charge. See *Commonwealth* v. *Farrell*, 322 Mass. 606, 621 (1948); *Commonwealth* v. *Sheehan*, 376 Mass. 765, 772 (1978); *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984); *Commonwealth* v. *Lanoue*, 392 Mass. 583, 592 n.6 (1984); *Commonwealth* v. *Henson*, 394 Mass. 584, 594 (1985); *Commonwealth* v. *Fano*, 400 Mass. 296, 305 n.14 (1987); *Commonwealth* v. *Sylvester*, 400 Mass. 334, 336 (1987); *Commonwealth* v. *Shea*, 401 Mass. 731, 743-744 (1988); *Commonwealth* v. *Angelone*, 413 Mass. 82, 84 (1992) ("It is well established that intoxication caused by the voluntary consumption of alcohol or another drug cannot be a basis for a finding that a defendant lacked criminal responsibility"). See also Perkins & Boyce, Criminal Law 1006 (3d ed. 1982) (voluntary drunkenness is no excuse for homicide; without justification or excuse, homicide cannot be less than manslaughter). "[W]ell established by the cases . . . is the rule that no amount of voluntary intoxication can entirely excuse a homicide and thereby entitle the slayer to an acquittal." *Id.* at 1010. See also 1 LaFave & Scott, Criminal Law § 4.10 (1986); Model Penal Code § 2.08(2).

structed that the defendant's voluntary intoxication might negate the element of malice, they should be instructed on voluntary and involuntary manslaughter, if appropriate on the evidence, in terms of their traditional elements. Concededly, that was not done here.

Voluntary manslaughter requires an intent to kill in certain mitigating circumstances. See *Commonwealth* v. *Webster*, 5 Cush. 295, 303 (1850); *Commonwealth* v. *Henson*, 394 Mass. 584, 591 (1985); *Commonwealth* v. *Nardone*, 406 Mass. 123, 131 (1989). A homicide that would otherwise be murder is voluntary manslaughter if the defendant kills in a sudden heat of passion aroused by adequate provocation. See *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931); *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). The provocation must be that which would arouse a heat of passion in a reasonably sober person; if voluntary intoxication were to have the effect of rendering an individual unreasonably subject to provocation, the offense would not be reduced to manslaughter. See *Commonwealth* v. *Garabedian*, 399 Mass. 304, 315 (1987). It would be improper, therefore, for a judge to instruct a jury that evidence of intoxication could be considered in determining whether there was such reasonable provocation as would lessen the degree of the crime to voluntary manslaughter. We do not consider the challenged instruction, therefore, as one on voluntary manslaughter.

Involuntary manslaughter is "an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967). *Commonwealth* v. *Martinez*, 393 Mass. 612, 613 (1985). Alternatively, involuntary manslaughter may consist of a battery causing death in circumstances in which the defendant "is, or should be, cognizant of the fact that the battery he is committing endangers human life." *Commonwealth* v. *Catalina*, 407 Mass. 779, 787 (1990). See also *Commonwealth* v. *Sneed*, 413 Mass. 387, 394 (1992). The challenged instruction did not

expressly set forth the requirements for involuntary manslaughter. Viewing the challenged instruction in light of the entire charge and the way in which a reasonable juror would likely have interpreted it, however, we do not think there was a substantial risk that the defendant was convicted without the required elements of involuntary manslaughter.

The instructions on manslaughter have to be read in combination with the instructions on murder to which they directly related. Manslaughter would be considered, according to those instructions, if the jury found the elements of murder but had a reasonable doubt about the specific intent or state of mind required for malice. The judge was explicit in instructing that to find manslaughter the jury had to find an unlawful nonaccidental[7] killing of the victim by the defendant. According to well-established case law in this Commonwealth, an unlawful killing that is not murder is manslaughter. See *Commonwealth* v. *Demboski*, 283 Mass. 315, 322 (1933); *Commonwealth* v. *Stokes*, 374 Mass. 583, 592 (1978); *Commonwealth* v. *DelVerde*, 398 Mass. 288, 297 (1986), citing *Commonwealth* v. *Webster*, 5 Cush. 295, 304 (1850); *Commonwealth* v. *Sullivan*, 29 Mass. App. Ct. 93, 97 (1990). There is no indication in the few sentences quoted from the *Sires* opinion that the court intended to overrule such an established rule, thereby effecting a substantial change in the law of homicide. The issue decided in *Sires* was whether it was reversible error in a first degree murder case not to instruct the jury on the defendant's theory of involuntary manslaughter that had no support in the evidence. Compare *Commonwealth* v. *Nardone*, 406 Mass. 123, 132 (1989). That the failure to give such an instruction upon request on the particular facts in *Sires* was not reversible error

---

[7]In addition to his instruction on accident, the judge referred to accident again in answer to a question. Two hours after deliberations had begun, the jury sent the trial judge a note posing three questions, one of which read: "If we determine the death to be by accident which is the correct verdict? Murder One, Murder Two, Manslaughter, Not Guilty." After consulting with both parties, the judge answered that if the death was accidental the correct verdict was not guilty.

does not necessarily mean it is reversible error, on different facts, for a judge to give a similar instruction upon request.

In any event, the defendant was not prejudiced by the instruction. The defense at trial in this case was, first, that the death was accidental. If that defense should fail, the defendant's strategy was to rely upon evidence of his intoxication and of a fight he had with the victim in an effort to reduce the crime from murder to manslaughter. The requested instruction, without undercutting the accident theory, would have appeared likely to defense counsel at trial to help bring about a verdict other than murder. The jury rejected the defense of accident and found either voluntary manslaughter on the basis of reasonable provocation or involuntary manslaughter on the basis of the challenged instruction. The defendant does not contend that a voluntary manslaughter conviction would have been improper on the evidence. Assuming the jury found involuntary manslaughter, the question is whether the jury could reasonably have found the defendant guilty without the required elements. Given the absence of either accident or malice, there was no basis in the evidence for a finding of anything other than a battery or a wanton and reckless act which a reasonable person, in the circumstances, should have known would endanger the victim's life.

The jury having found manslaughter, the defendant's strategy succeeded. The circumstantial evidence of the defendant's guilt was strong. He has failed to sustain his burden on appeal of showing that granting his request at trial for the instruction he now challenges caused him substantial prejudice.

*Judgment affirmed.*