## COMMONWEALTH *vs.* ERNAN FIGUEROA.

No. 00-P-1112.

Suffolk. November 6, 2001. - December 5, 2002.

Present: BROWN, GREENBERG, & McHUGH, JJ.

*Homicide. Practice, Criminal,* Voluntariness of statement, Instructions to jury. *Evidence,* Voluntariness of statement, Photograph, Authentication. *Wanton or Reckless Conduct. Words,* "Accident."

At the trial of indictments alleging murder on a joint venture theory and possession of a firearm, the judge properly admitted in evidence certain statements that the defendant made to a police officer, where none of the statements was made in response to a question by the officer. [643-645]

At the trial of indictments alleging murder on a joint venture theory and possession of a firearm, the judge did not abuse her discretion in admitting in evidence four photographs of the defendant and a coventurer holding firearms resembling those recovered from the crime scene, where there was sufficient circumstantial authentication of the accuracy of the photographs to allow their admission. [645-647]

At the trial of indictments alleging murder on a joint venture theory and possession of a firearm, the judge properly instructed the jury that the Commonwealth did not have to prove the absence of an accident in order for the jury to convict the defendant of involuntary manslaughter, and properly denied' the defendant's request for an instruction to the opposite effect, where the evidence, even when viewed in a light most favorable to the defendant, did not warrant an accident instruction, in that involuntary manslaughter is a crime that does not involve an intentional killing, and therefore an accident is not exculpatory; and in that the evidence did not fairly raise the possibility that the defendant's coventurer shot the victim unintentionally while engaged in conduct that was neither wanton nor reckless. [647-651]

INDICTMENTS found and returned in the Superior Court Department on June 27, 1996.

Pretrial motions to suppress evidence were heard by *Diane M. Kottmyer,* J., and the cases were tried before her.

*Joseph S. Berman* for the defendant.

*Alex G. Philipson,* Assistant District Attorney, for the Commonwealth.

McHugh, J. Following a street-corner argument late on the night of May 15, 1996, Miguel Reyes shot and killed Vannaroth Ouk. Reyes's friend, the defendant, Ernan Figueroa, his own pistol drawn and cocked, was standing nearby when the shooting occurred. The defendant was thereafter indicted for Ouk's murder, see G. L. c. 265, § 1, on a joint venture theory, and for possession of a firearm. See G. L. c. 269, § 10(*a*). Following trial, he was convicted of involuntary manslaughter and of the firearms charge. On appeal, the defendant principally argues that statements he made to police should have been suppressed, that certain photographs were insufficiently authenticated and should have been excluded, and that the judge erroneously instructed the jury that the Commonwealth was not required to prove the absence of an "accidental" shooting in order to prove involuntary manslaughter.[1] There was no error in the judge's careful handling of the trial and we therefore affirm.

[1]The defendant makes two other claims that require no extended discussion. First, he asserts that the trial judge erroneously admitted evidence of a spontaneous exclamation describing the shooting and the defendant's actions at the scene. The exclamation was made to a police officer by a young man named Falabella shortly after the shooting took place and at a time when the trial judge found that Falabella was visibly upset about what he had seen. The defendant claims that it was error to admit the statement because Falabella was a member of the Boston Red Dragons (BRD), a street gang that had a history of problems and disputes with the defendant. Accordingly, the defendant claims, Falabella was biased against him. The trial judge has "broad discretion" to determine whether a statement is admissible as a spontaneous exclamation, *Commonwealth* v. *Whelton*, 428 Mass. 24, 26 (1998), and, on review, our function is limited to determining whether that discretion was abused. *Commonwealth* v. *Dayes*, 49 Mass. App. Ct. 419, 422 (2000). Our review of the record shows no such abuse.

Second, the defendant challenges the trial judge's denial of his motion for a required finding of not guilty, claiming that there was insufficient evidence to permit a reasonable jury to find that he knew before the shooting that Reyes had a firearm. We view the evidence on that score in the light most favorable to the Commonwealth. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). So viewed, enough was there. There was evidence that Reyes and the defendant knew each other well, that the defendant knew Reyes had at least one firearm, that both the defendant and Reyes took pride in displaying the firearms they possessed, that on the night of the shooting they emerged together from an apartment at 47-49 Sumner Street and went directly to 56 Sumner Street where a group of BRD members had gathered on the front porch, that they went to the porch for the purpose of redressing some grievances they had with at least some BRD members, that they immediately engaged the larger BRD group in a confrontational argument, that as the

Much of the factual detail is most helpfully recited in the context of the alleged errors about which the defendant complains. By way of overview, however, witnesses testified at trial that a group of people, many of whom belonged to the Boston Red Dragons (BRD), a street gang, were standing and sitting on the porch of 56 Sumner Street in Revere late on the evening of May 15. The defendant and Reyes, witnesses said, came out of a nearby house at 47-49 Sumner Street and approached the group. The two men began exchanging words with the group and the words quickly mushroomed into argument. The victim, Ouk, approached Reyes. Reyes and Ouk then moved into the middle of Sumner Street, arguing as they went.

As Reyes and Ouk stood in the street "almost face to face," Reyes drew his gun. Visibly unarmed, Ouk threw his hands in the air and said, "Shoot me motherfucker if you're going to shoot me." Although witnesses varied slightly in their descriptions of what happened next, the essence of their testimony was that Reyes swung or punched at Ouk with the pistol he was holding. As he did, he discharged the weapon, firing a single shot into Ouk's chest.

While the mid-street confrontation between Ouk and Reyes progressed, the defendant stood to one side of the group, near a fence along the porch. One witness testified to hearing a gun cock in the defendant's vicinity. Another testified to seeing the defendant point a pistol toward the porch. When police later recovered from beneath a nearby trash can what the Commonwealth claimed was the defendant's pistol, they found it cocked with a round in the chamber.

1. *Motion to suppress.* The defendant's first claim of error focuses on the trial judge's denial of his motion to suppress certain statements he made to police. He claims that police obtained those statements in violation of his right to counsel

argument began, the defendant, armed with a semiautomatic .45 caliber pistol and fourteen rounds of ammunition, immediately cocked and displayed his pistol as Reyes and Ouk moved to the middle of the street, and that, after the shooting, the defendant's pistol was found next to Reyes's beneath a trash can adjacent to a nearby house. From that evidence, the jury were fully warranted in concluding beyond a reasonable doubt that the defendant knew that Reyes had not left his pistol at home when the two went out to settle their dispute with the BRD members on the night of May 15.

and that he made the statements involuntarily. The trial judge, on factual findings the defendant does not challenge, rightly denied his motion.

The judge's factual findings are to the following effect. The grand jury returned the indictments against the defendant in June of 1996. By then, however, the defendant had disappeared from the local scene. In 1998, local authorities learned that the defendant had been arrested and jailed in New York for an unrelated offense. After appropriate process issued, Revere police Detective John Goodwin and State police Trooper Michael Conti were sent to New York to pick him up and return him to Massachusetts.[2]

The two officers drove the defendant from the Coxsackie Correctional Institute in Fishkill, New York, to Massachusetts on June 19, 1998, in a rented automobile.[3] The trip to Massachusetts lasted about three and one-half to four hours. Conti drove and Goodwin sat in the back seat with the defendant. Throughout the trip, the defendant, although "cuffed and shackled," engaged in what the trial judge found was "congenial conversation" with Goodwin. At no point before or during the ride did the officers give the defendant a Miranda warning.

Along with a series of immaterial topics, the defendant and Goodwin discussed the defendant's whereabouts while a fugitive. That discussion took what the judge found was the form of questions by the defendant followed by Goodwin's responses and follow-up questions.[4] During the conversation, the defendant asked if there were still a lot of Chinese in Revere and Detective Goodwin responded, "Cambodians." The

---

[2]The defendant's local counsel, upon learning that the officers were going to New York to retrieve him, wrote to the assistant district attorney handling the case and asked her to tell the officers not to question the defendant about the case during the trip to Massachusetts. In response, the assistant district attorney instructed the officers that they were not to initiate any discussion with the defendant about the crimes but that they could "enter into . . . a discussion if it [was] initiated by the defendant."

[3]Goodwin knew the defendant and greeted him as "Pito" when he met him at the Coxsackie facility. Goodwin's greeting produced a response from the defendant. The trial judge suppressed the response because it resulted from the greeting Goodwin initiated.

[4]At trial, the Commonwealth did not attempt to introduce in evidence any statements concerning the defendant's whereabouts while a fugitive.

defendant asked about the BRD and said that, before the shoot-
ing, the BRD had been harassing him in the apartment where he
had been staying with his girlfriend, and that they had broken
windows, had been shooting a shotgun in a nearby alleyway,
and had been "messing with us."

At some point, the defendant asked whether "Mike" (Miguel
Reyes) had been caught. Detective Goodwin said that he had
been caught after a car stop in Philadelphia. In response, the
defendant said, "That night Mike did his thing and fucked up
my life." He continued by saying that he wanted to get on with
his life and get his life straightened out. The trial judge found
that none of the statements about the "Chinese," the BRD, or
"Mike" was made in response to a question by Detective
Goodwin. She thus denied the motion to suppress and admitted
all of the statements at trial.

The judge was correct. Neither the defendant's Fifth nor his
Sixth Amendment rights were violated by admission of the
statements because the defendant gave them freely and none
was elicited by Detective Goodwin. See *Miranda* v. *Arizona*,
384 U.S. 436, 478 (1966) ("Any statement given freely and
voluntarily without any compelling influences is, of course,
admissible in evidence"); *Commonwealth* v. *Torres*, 424 Mass.
792, 796-797 (1997). The defendant, not Detective Goodwin,
began the conversation in which he made the statements, and
there was no evidence that Detective Goodwin coerced or
tricked him into making them. See *Commonwealth* v. *Chipman*,
418 Mass. 262, 272-273 (1994); *Commonwealth* v. *Diaz*, 422
Mass. 269, 271 (1996); *Commonwealth* v. *Duguay*, 430 Mass.
397, 401 (1999). As the trial judge rightly concluded, Detective
Goodwin's discourse and conduct in reaction to the defendant's
questions were not the functional equivalent of interrogation,
see *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980), and
"[t]he officers were not required to rebuff all attempts by [the
defendant] to engage them in conversation and sit in silence for
the entirety of the three and one-half to four-hour trip" from
New York to Massachusetts.

2. *Photographic evidence.* The defendant's second claim is
that the trial judge erroneously admitted four photographs of the
defendant and Reyes holding firearms resembling those

recovered from the crime scene.[5] The photographs, the defendant claims, were insufficiently authenticated to permit their admission.

Photographs usually are authenticated directly through competent testimony that the scene they show is a fair and accurate representation of something the witness actually saw. See *Commonwealth* v. *Weichell,* 390 Mass. 62, 77 (1983), cert. denied, 465 U.S. 1032 (1984); *Commonwealth* v. *Ames,* 410 Mass. 603, 605 n.3 (1991); Liacos, Massachusetts Evidence § 11.13.1, at 728 (7th ed. 1999). But authenticity also can be established circumstantially by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Proposed Mass.R.Evid. 901(a). See *Commonwealth* v. *Duddie Ford, Inc.,* 28 Mass. App. Ct. 426, 435 & n.10 (1990), *S.C.,* 409 Mass. 387 (1991). Moreover, the authenticity of a photograph is a preliminary question of fact for resolution by the trial judge. See *Commonwealth* v. *Ames, supra;* Advisory Committee's Note to Proposed Mass.R.Evid. 901(a). In making that preliminary determination, the trial judge, with certain exceptions not here relevant, is not bound by the rules of evidence. See Proposed Mass.R.Evid. 104(a); Liacos, Massachusetts Evidence § 3.9.1, at 89 (7th ed. 1999). Once authenticated sufficiently for admission, remaining questions about a photograph's evidentiary value are for the trier of fact. See *Commonwealth* v. *Jordan,* 50 Mass. App. Ct. 369, 371-372 (2000). All of those principles inhere in the overarching principle that "[t]he admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Obershaw,* 435 Mass. 794, 803 (2002), quoting from *Commonwealth* v. *Waters,* 399 Mass. 708, 715 (1987). See *Commonwealth* v. *Vizcarrondo,* 431 Mass. 360, 362-363 (2000).

When ruling that the photographs were admissible in this case, the trial judge had before her the defendant's affidavit say-

---

[5]One photograph showed Reyes holding a semiautomatic handgun, a second showed the defendant holding a semiautomatic handgun, a third showed the defendant holding a revolver and Reyes holding a semiautomatic handgun, and the fourth showed Reyes with both firearms in his waistband.

ing that the photographs came from film he gave to a woman named Katissa Perez to have developed[6]; Revere police Detective Theodore Michalski's testimony that he obtained the photographs from the owner of a photo shop who had called him two days before the shooting to say that she had received from "Kathy," of 49 Sumner Street, the film containing the images from which she made the prints in question; the results of a police investigation showing that "Kathy" was Katissa Perez; direct evidence from trial witnesses that Reyes and the defendant were together on the night of the shooting; and pistols recovered near the scene of the shooting that resembled those shown in the photographs. Together that was sufficient circumstantial authentication of the accuracy of the photographs to allow their admission, and the judge did not abuse her discretion in admitting them.

3. *Jury instructions.* Finally, the defendant challenges the trial judge's instruction, over his objection, that the Commonwealth did not have to prove the absence of an accident in order for the jury to convict him of involuntary manslaughter. He also claims that the judge should have allowed his request for an instruction to the opposite effect, i.e., that to prove involuntary manslaughter, the Commonwealth was required to prove that the killing was no accident. Even when the evidence is viewed, as it must be, in the light most favorable to the defendant, see *Commonwealth* v. *Squailia*, 429 Mass. 101, 109 (1999), and even recognizing that in cases where the issue is fairly raised, "the judge, at least on request, is obliged to charge the jury that the Commonwealth has the burden to prove beyond a reasonable doubt that the shooting was not accidental," *Commonwealth* v. *Palmariello*, 392 Mass. 126, 145 (1984), an accident instruction was not warranted by the evidence and the trial judge's instruction on the subject was not error.[7]

In our criminal jurisprudence, "accident" is an exculpatory

---

[6]The defendant had filed the affidavit in connection with a pretrial motion to suppress the photographs. The judge denied that motion in a ruling from which the defendant has not appealed. See generally *United States* v. *Manning*, 56 F.3d 1188, 1198-1199 (9th Cir. 1995).

[7]The Commonwealth goes further and argues that the evidence most favorable to the defendant warranted no manslaughter instruction at all and therefore that any error in the instruction's content was inconsequential. See *Com-*

concept. See *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 514 n.7 (2000) ("justification" or "excuse" for criminal conduct "includes, among other things, accident, mistake, self-defense, and defense of another"); Nolan & Sartorio, Criminal Law § 687, at 723 (3d ed. 2001) ("If an act is caused by accident, it cannot be criminal"). But our decisions use the term in two different senses and our opinions have not always found it necessary to distinguish between them. See, e.g., *Commonwealth* v. *Talkowski*, 33 Mass. App. Ct. 720, 725-727 & n.7 (1992); *Commonwealth* v. *Knight*, 37 Mass. App. Ct. 92, 104-105 & n.7 (1994); *Commonwealth* v. *Niland*, 45 Mass. App. Ct. 526, 532-533 (1998).

In the first of the two senses, the term "accident" is a label for the unintended consequences of a defendant's act. See Massachusetts Superior Court Criminal Practice Jury Instructions § 3.13 (1999) (Accidental events are "unexpected happening[s] that occur[] without intention or design on the defendant's part. [They are] sudden unexpected event[s] that take[] place without the defendant's intending [them]"). See also *Commonwealth* v. *Ferguson*, 30 Mass. App. Ct. 580, 582 n.1 (1991), citing Model Jury Instructions for Use in the District Court, Instruction 6:09 (1988 ed. & Supp. 1989). When used in that sense, the focus is on the consequences of the defendant's act. The unintended nature of those consequences is exculpatory if and to the extent that conviction of a particular crime requires the Commonwealth to prove that the consequences were intended. See, e.g., *Commonwealth* v. *Lussier*, 333 Mass. 83, 92-93 (1955); *Lannon* v. *Commonwealth*, 379 Mass. 786, 790 (1980) ("[m]alice is not present . . . where a gun discharged accidentally"); *Commonwealth* v. *Robinson*, 382 Mass. 189, 203 (1981); *Commonwealth* v. *Zezima*, 387 Mass. 748, 756 (1982) ("proof of malice depend[s] on proof of the absence of accident").

When used in the first sense, therefore, an "accident" is not exculpatory if the defendant's intent to bring about what the defendant claims were the unintended consequences of his or

*monwealth* v. *Roderick*, 429 Mass. 271, 278 (1999). There is much force to the Commonwealth's position. See *Commonwealth* v. *Diaz*, 431 Mass. 822, 831 (2000). Nevertheless, because there was no error in the instruction and because explaining why there was no error may help in understanding the two different roles "accident" plays in the defense of criminal cases, we proceed.

her act is not an element of the crime for which he or she is on trial. See *Commonwealth* v. *Evans*, 390 Mass. 144, 151-152 (1983) (felony-murder rule makes accidental discharge of a weapon irrelevant because intent to commit the felony, not the killing, provides the requisite malice); *Commonwealth* v. *Griffith*, 404 Mass. 256, 260-261 (1989) (same). Because involuntary manslaughter is a crime that does not involve an intentional killing, *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990), quoting from *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967) (involuntary manslaughter is "an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct"), accidents in this first sense are not exculpatory. See *Lannon* v. *Commonwealth*, 379 Mass. at 790 (judge charged that jury had to consider the crime of involuntary manslaughter if it accepted the defendant's contention that the gun had discharged "accidentally"). Compare *Commonwealth* v. *Clark*, 363 Mass. 467, 471-472 (1973) (involuntary manslaughter instruction would be warranted if the evidence supported a conclusion that the gun was discharged by "accident or wanton or reckless conduct").[8] Cf. *Commonwealth* v. *Hakala*, 22 Mass. App. Ct. 921, 923 (1986) (in trial on assault and battery by means of a dangerous weapon, charge that Commonwealth must prove defendant was recklessly indifferent that bullet might strike victim gave the defendant the benefit of his claim that shooting was an "accident"). In connection with the charge of involuntary manslaughter, then, the defendant was not entitled to an instruction on accident in the first sense and conviction did not require the Commonwealth to prove its absence.

When used in the second, and more broadly exculpatory, of

---

[8]Indeed, all involuntary manslaughters are "accidents" in the sense that they do not involve intentional killings. See *Commonwealth* v. *De Los Santos*, 37 Mass. App. Ct. 526 (1994); *Commonwealth* v. *Van Liew*, 38 Mass. App. Ct. 934, 935 (1995). Cf. *Commonwealth* v. *Jones*, 382 Mass. 387 (1981); *Commonwealth* v. *Talkowski*, 33 Mass. App. Ct. at 726-727. Voluntary manslaughter, on the other hand, does involve an intentional killing. *Commonwealth* v. *Squailia*, 429 Mass. at 109. Accordingly, "accidents" in the first sense do have an exculpatory role in a case where the defendant is charged with that crime. See *ibid.*

the two senses, the term "accident," although presupposing an unintended result, focuses on the nature of the conduct that produced that result and not simply on the result itself. Sometimes calling this second type of accident a "pure" accident, see *Commonwealth* v. *Palmariello*, 392 Mass. at 145 n.4; *Commonwealth* v. *Van Liew*, 38 Mass. App. Ct. 934, 935 (1995), cases use the term to describe an unintentional event occurring through inadvertence, mistake, or negligence. Because proof of involuntary manslaughter requires proof of wanton or reckless conduct, see *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944) ("[t]he essence of wanton or reckless conduct is intentional conduct . . . which . . . involves a high degree of likelihood that substantial harm will result to another"), and because wanton or reckless conduct displays far greater indifference to likely harmful consequences than negligence or even gross negligence, see *Commonwealth* v. *Levesque*, 436 Mass. 443, 451-452 (2002), the concept of accident in this second sense is a defense to a charge of involuntary manslaughter. See *Commonwealth* v. *Bouvier*, 316 Mass. 489, 495-496 (1944) (involuntary manslaughter judgment reversed where evidence would at most support a conclusion that the defendant was negligent and thus "it could not have been found properly that the discharge of the gun was other than accidental"); *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 & n.19 (1980) (charge distinguished between negligent or inadvertent conduct and wanton and reckless conduct); *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. 401 (1997); *Commonwealth* v. *Niland*, 45 Mass. App. Ct. at 533.[9]

The question thus becomes whether the evidence at trial fairly raised the possibility that Reyes shot Ouk unintentionally while engaged in conduct that was neither wanton nor reckless. If so, the defendant was entitled to an instruction on accident in the second sense; if not, no such instruction was required. See

---

[9]Neither in *Depradine* nor in *Niland* did we explicitly say that we were using the term "accident" in the second sense. Nevertheless, our discussion of the evidence in both cases showed, at least inferentially, that our references to "accidents" were necessarily references to accidents in the second sense of the term. See *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. at 405-407; *Commonwealth* v. *Niland*, 45 Mass. App. Ct. at 527-528.

generally *Commonwealth* v. *Kingston*, 46 Mass. App. Ct. 444, 449-450 & n.10 (1999).

Viewed in the light most favorable to the defendant, the evidence was that Reyes, after pulling from his pocket a loaded revolver equipped neither with a trigger safety nor with another device designed to prevent its discharge, and after hearing Ouk say "shoot me," threw a punch at Ouk with the hand in which he held the pistol while his finger was on the trigger[10] and that the weapon discharged as the punch landed. Even without knowing the consequences, no reasonable person could possibly conclude that such an extraordinarily dangerous act amounted to something less than wanton and reckless conduct.[11] No accident instruction was therefore required.[12]

*Judgments affirmed.*

---

[10]There was evidence at the trial that Reyes's pistol was in good working order and that the weapon was fired by pulling the trigger. There was no evidence that the pistol could be fired in any other way.

[11]Indeed, in arguing the point at trial, the defendant's trial counsel said as follows:

> "There's another issue you'll have to decide as well. There's another crime called manslaughter that [the judge] will explain to you [that] if someone acts in such a wanton and reckless fashion that it causes the death, then that person can be convicted of manslaughter. In this case, the evidence that would support that, I suggest to you, would be trying to strike somebody, Reyes trying to strike somebody with a gun, and the gun going off in the course of that. And if you're satisfied that that's the way it happened, then you will be obligated to return a verdict of guilty of manslaughter, but you have to be satisfied as to Mr. Figueroa's mental status. What was in his mind?"

Compare *Commonwealth* v. *Talkowski*, 33 Mass. App. Ct. at 725-726 & n.7.

[12]The judge did charge that the Commonwealth was required to prove absence of an accident in order to return a verdict of guilty of first or second degree murder. Although she did not spell out the term's meaning, the Commonwealth's burden there was only to disprove an accident in the term's first sense. Having given those instructions, it was appropriate for the judge to tell the jury that no such proof was required in connection with the involuntary manslaughter charge. Generally, however, because the term "accident" has a confusing potential, it is preferable to omit using the term entirely in cases that do not require an accident charge and instead to instruct simply on the accident-negating elements of involuntary manslaughter. See *Commonwealth* v. *Lowe*, 391 Mass. 97, 108-112, cert. denied, 469 U.S. 840 (1984), *S.C.*, 405 Mass. 1104 (1989). Compare *Commonwealth* v. *Zaccagnini*, 383 Mass. 615, 617-618 (1981).